KEITHLER *v.* THE STATE, 10 Smedes & Marshall, 192.

### MURDER—ACCESSORY.

The duty of the district attorney is to prosecute offenders; but in his absence the state has a right to employ other counsel, and the duty performed by them will be valid.

The legislature has power by the constitution, to provide for the filling of all vacancies; and if the absence of the district attorney cause even a temporary vacancy it may be provided for by legislation.

No offense except perjury and subornation of perjury will disqualify or render a person incompetent to be sworn and testify as a witness in any cause; but such conviction may, in all cases, be given in evidence to impeach the credibility of the person so testifying. That he was an accomplice, does not render him incompetent as a witness against his principal.

The record of the conviction of the principal is evidence against the accessory. It is competent to prove the conviction of the principal and all its legal consequences; but not evidence of the fact of the guilt of the accessory.

The judge of the circuit court has a right to modify instructions asked by counsel, so as to make them conform to his own view of the law. And if a party object to such modifications, he must embody them in his bill of exceptions.

The charge or modification must be in writing, unless by consent of the parties to the contrary; and, in the absence of any objections on the record, such assent will be presumed.

The testimony of an accomplice should be received with great caution by the jury, but it is impossible to say that he should not be believed. The jury are to determine his credibility from his manner and other surrounding circumstances.

A voluntary confession of an accomplice is entitled to little weight; and if a different statement afterwards, under oath, when circumstances have changed his condition, it will be for the jury to say whether they will disbelieve him on account of such discrepancy.

When an accomplice, under sentence of death, without hope of pardon, it will be supposed that all motive to falsehood had ceased to exist.

It is the duty, but not an essential one, that the district attorney should sign the bill of indictment; but the absence of his signature does not affect the validity of the indictment.

If S. has already formed the murderous design, and K. encourage him to carry it out, by stating falsehood, or otherwise, K. is guilty as accessory.

Error to Hinds circuit court. COALTER, J.

The grand jury of Hinds county at the November term of the circuit court, 1846, found an indictment against Jack Fountain Silas, as principal, and Henry Keithler as accessory, of the murder of Benjamin G. Sims, on the 6th of July, 1846. The indictment was signed " J. E. Sharkey, district attorney, *pro tem.*, 3d judicial district."

A change of *venue* was obtained to Claiborne county, in the case of Silas, the principal, and Keithler was tried at the May term, 1847, of the circuit court of Hinds county. The state was represented by Fulton Anderson, district attorney of the district; the prisoner pleaded not guilty; a jury was empanelled and the case tried, and the prisoner, after a trial of two days, was found guilty and sentenced to be hung.

The other facts of the case will be found at length in the opinion of the court.[1]

SHARKEY, C. J.:

The several points made in the argument of this case, will be disposed of in the order adopted in the assignment of errors.

First. The indictment is said to be defective, because it is not signed by the district attorney for the district, but by an attorney who acted under the appointment of the court, the district attorney being absent. It is contended that as the district attorney is an officer elected under the constitution for the discharge of certain duties, his place cannot be supplied by temporary appointment in his absence, and that the law authorizing such appointment is unconstitutional. We do not think so. We are not prepared to say that the legislature may not provide that ministerial duties may be performed by a person appointed according to the law in the absence of the incumbent. The duty of the district attorney is to prosecute offenders against the criminal law. He acts as counsel for the state, and in his absence the state has a right to employ other counsel, and the duty so discharged is valid.[2] The constitution declares that a compe-

[1] [The evidence, confessions, etc., are set forth at length in the original report of this, in 10 S. & M. Reports, 192; but the present compiler feels justified in leaving it out altogether, as it is sufficiently stated in the opinion of the court.]

[2] Wharton Am. Cr. Law, 474; Reynolds v. State, 11 Tex. 120; Isham v. State, 1 Smeed, 112; 1 Archbold Cr. Pr. & Pl., 320; State v. Cox, 6 Iredell, 44; Eppes v. State, 10 Tex., 474.

tent number of district attorneys shall be elected, whose term of office shall be prescribed by law.    This provision is very general, leaving everything with the legislature, except the election.    It is by law, then, that the district attorney is required to attend the circuit courts and prosecute, and the same law may very well provide for prosecuting, when he shall be absent.    The legislature has power, by a provision in the constitution, to provide for filling of all vacancies not therein provided for.    Article 5, § 13.    If the absence of the district attorney causes even a temporary vacancy, under this provision it may be provided for by the legislature.

On this point the case of Byrd v. The State has been cited, but it does not sustain the counsel.    It, in fact, decides the question the other way, by deciding that the district attorney may withdraw and leave the prosecution to others.    On the position taken, it would be impossible to prosecute a district attorney; he would be entirely exempted from offense.

Second, It is said the court erred in admitting Silas, the principal, who had been convicted and was under sentence, to testify. The statute furnishes the answer to this objection.    It provides that no conviction for any offense, excepting perjury and subornation of perjury, shall disqualify or render such person incompetent to be sworn and to testify in any cause, matter or proceeding, civil or criminal ; but such conviction may in all cases be given in evidence to impeach the credibility of the person so testifying.    H. & H. Dig., 725, § 18.    The language of this statute is not to be understood literally, as a difficulty might arise from it.    It says *conviction* shall not disqualify.    Mere conviction never did disqualify ; it is the judgment that disqualifies ; though it is usually said by law writers that conviction disqualifies, and hence the language of this statute. [1]    See 1 Phillips Evid., 30.    The legislature intended no doubt to remove a legal disability, and the statute must be so construed.    That he was an accomplice, constitutes no objection to his being a witness. [2]    1 Phillips, 30.    As the statute removes the infamy,

[1] See Wharton Am. Cr. Law, 761, and notes.    See also 4 Bishop Cr. Law, 363, note 3.

[2] 1 Greenl. Ev., 379–383; Swift's Ev., 146; Wharton Am. Cr. Law, 145.

a principal may now testify against the accessory.[1] People v. Whipple, 9 Cow., 707; 1 Phil., 40.

Third, The next objection was made to the admissibility of the record of the conviction of Silas. That the record of the conviction of the principal is evidence against the accessory will surely not be doubted.[2] It was evidence to prove the conviction of Silas and all the legal consequences, though of course not evidence of the fact of the guilt of the prisoner. But this record is said to be defective in the caption and in the certificate of the clerk. After a very careful examination, we do not perceive any valid objection to it. It is sufficient in these particulars, both in form and substance. See third vol., Notes to Phillips Evid., 820, note 582.[3]

Fourth, It is also assigned for error, that the court erred in giving the instructions asked by the state, and in modifying those asked for the prisoner. The district attorney asked but one instruction, to wit: That it was immaterial whether Silas conceived the design to kill Sims before his interview with the prisoner or not. If Keithler encouraged him in that design, by falsely stating to him threats made by Sims, or by persuading him to kill Sims, Keithler is guilty. This charge was undoubtedly proper.

The counsel for the prisoner asked thirteen instructions, and the court gave all except two, the ninth and eleventh, and they were given with modifications. But how far they were modified, does not appear, and we cannot, of course, undertake to say, whether the modifications were correct or not. The charges, as they were asked, are set out in the bill of exceptions, but the modifications are not. That the court had a right to modify its instructions, has been decided at the present term.[4] For anything that appears, the modifications may have been favorable to the prisoner, and this is probably the case, as it appears by the bill of exceptions that the prisoner's counsel did not object, because they were given verbally. Some controversy arose after the jury had retired about the instructions, when the prisoner's

---

[1] George v. State, 39 Miss., 570; Josephine v. State, ib., 613.

[2] Wharton Am. Cr. Law, 141; State v. Duncan, 6 Iredell, 236; Commonwealth v. Knapp, 10 Pick., 477.

[3] See case and authorities cited in note [2] *supra.*

[4] Boles v. State, 9 S & M., 284. See also cases cited therein.

counsel asked the court to reduce its modifications to writing, which was done, and thereupon the counsel stated, that no objection would have been made to the instructions in that form, but the modifications were understood differently. A request was made that the jury might be called to hear the instructions as written down read to them, which the court refused, saying they were literally the same that had been verbally given. The counsel requested that the written modifications might be sent to the jury room, which was also refused. The argument predicated on this state of things is, that the court had no right to give its instructions verbally. The law of 1813 prohibited the circuit judges from charging the jury unless the counsel differed as to the law and should ask a charge on some point to be distinctly specified. H. & H. Dig., 493, § 53. A subsequent law provided, that the judges should not charge the jury unless the counsel differed and a charge should be asked on some point to be distinctly stated in writing, and it prohibits the judge from charging as to any other point. H. & H. Dig., 482, § 9. This law does not require the judge to put any modifications that he might choose to make in writing. It would be too rigid to say that any modification, however slight, shall be reduced to writing, or the judgment will be reversed. If a party should object to such modification, he should embody it in a bill of exceptions, so that it may be seen whether it was to his prejudice. The law of 1846 requires, that all charges and modifications of charges shall be in writing, and, at the request of either party, the jury may take them to their room. Even if this law should extend to criminal cases, but it is not so understood, there is a provision in it which covers this case. The charge or modification must be in writing, unless *by the consent of both parties*. The bill of exceptions shows this consent, or rather it shows that the prisoner did not object that the modification was made verbally. In the absence of any objection appearing on the record, assent would be presumed. We cannot presume that the court violated the law. This then was not a question raised on the trial. The court was not asked to reduce the modification to writing until after the jury had retired; that was too late. Objections should be made at a time when they can be obviated.

It was said in argument that the tenth instruction is to be considered as having been refused, because the word " refused " is written on the margin. The body of the bill of exceptions must control; and there it is said all the instructions were given, except two, the ninth and eleventh, which were modified.

This brings us to the only remaining point, which it is necessary to consider, the refusal of the court to grant a new trial, which was moved for, because the verdict was contrary to the instructions and against the evidence. Undoubtedly this court may grant new trials when there is a great preponderance of evidence against the verdict. But there is no such preponderance here. On the contrary, the evidence sustains the verdict, if the main witness, Silas, is to be believed. It is therefore resolved into a question of credibility. It was insisted in argument that Silas was unworthy of belief, because of his having made contradictory statements in his several examinations and confessions, and therefore that a new trial should be granted. The question of credibility is one which belongs so exclusively to the jury, that it would be a delicate point for a court to touch it. True, the testimony of an accomplice should be weighed with great jealousy and distrust by a jury, but it is impossible to say, as a question of law, that he should not be believed. The jury are to determine that from his manner, his consistency, and other attending circumstances. They are to judge how far his testimony has been corroborated, or they may believe him if they choose without corroboration. We are disposed, however to give the prisoner every benefit which can result to him from a thorough sifting of the evidence, so far as we can do so consistently with our duty.

Silas was introduced as a witness, and in the course of his examination, his voluntary confession, made when he was taken before the court of inquiry, was introduced. His testimony before the committing court in the case of Keithler, was also introduced; and lastly, his confession made since his conviction. The object was to impeach his credibility from his own contradictory statements. As might be expected, there are discrepancies. In every instance, he implicated Keithler. His statements do not vary in charging him with being the instigator

and cause of the offense. His voluntary confession does contain statements which are afterwards contradicted. He then stated that Sims had cut his finger with a knife. This he afterwards contradicted. He also said that he had shot Sims but once; this, too, is contradicted, both by his subsequent statements and by Anna Sims. He also said that he offered to speak to Sims before he shot him, and this is contradicted, and perhaps he contradicts himself in other points. When he was under examination as a witness on the final trial of Keithler, he stated that his mind was confused from long confinement, and he concludes his testimony by saying, that he had not stated the one-tenth or one-hundredth part of what passed between him and Keithler; that the murder of Sims was a continued subject of conversation. A voluntary confession is entitled to but little weight, as it is but natural that one accused of crime should endeavor to palliate his guilt by excuses. And if a different statement should be afterwards made under oath, when circumstances have changed the condition of the party, it will be with the jury to say whether they will disbelieve him on account of such discrepancies. We cannot think that this would be an unerring indication of false swearing.

The published confession of Silas, made after his conviction, is more in detail than any person's statement. It was evidently written by another, as he could not write. Variations might naturally be expected under such circumstances, and yet in the main, it corresponds with his testimony.

In his testimony, given before the committing court, on the trial of Keithler, he says, that Keithler first mentioned the killing of Sims to him on the evening he (Silas) left Sims. In his subsequent examination, he said it was on the next day. He then also stated, that he received the cut on his finger from Sims, and with these exceptions, his testimony is not materially variant from his subsequent statements. He is contradicted in one particular by Anna Sims, a daughter of the deceased, twelve years of age. She says she was but forty or fifty yards off when Silas shot her father, and that he saw her. He persists in saying she was not there. It is possible he may not have seen her.

These contradictions doubtless had their due weight with the

jury. But it is proper to observe, that when he was called to testify against Keithler, he was under sentence of death, and as he says, without any hope of pardon. He testified, therefore, with the certainty of execution before him, when we must suppose all motive to tell a falsehood had ceased to have an influence.

Let us in the next place examine whether his statements, so often repeated in regard to the guilt of Keithler, are corroborated by the other witnesses; for although he may have weakened the strength of his testimony by his contradictions, yet if he is corroborated in the main fact, his testimony was still entitled to weight with the jury.

Philip Alston, a witness on the part of the state, went to the house of Sims immediately after the occurrence. Whilst he was there, Keithler was walking the gallery, and being called in, was asked by Mrs. Sims, if he had seen Silas. He replied, that he had seen him half an hour since riding toward Raymond with Bankstone. He was also asked by her, why he did not arrest him. He replied, that he knew nothing of the matter, until he came to the house. Let us contrast these statements of the prisoner with the testimony of another witness. Bankstone, a witness on the part of the state, heard the firing, and went over to Sims, and after having learned what was the matter, he went to the mill to arrest Silas. He then found Keithler, and told him what had occurred, and requested him to assist in arresting Silas. He replied that he would rather not, and wished Bankstone to get some other person. But upon being pressed to assist, he said he would tell Silas to give himself up, and accordingly started towards Silas on a trot, and met him at a point behind the shop, out of sight of the witness, who was some distance behind. What passed between them the witness did not know; but they met him, when Silas remarked, you have come for me. Keithler's answers to Mrs. Sims, in view of these facts, are certainly calculated to create suspicion. He knew all about the arrest of Silas, and yet he replied evasively, saying, that he had seen him half an hour since riding towards Raymond. He had been informed by Bankstone at the mill what had occurred, and yet he told her he knew nothing of it, until he came to the house. Why did he manifest so much reluctance in arresting

Silas? And that a private conversation passed between them behind the shop is clear, from the remark of Silas to Bankstone. Silas surrendered by the advice of Keithler.

These circumstances are inconsistent with the conduct of one who was acting without some secret motive, and desirous to detect the guilty. But he also stated to Bankstone, as a reason for his reluctance, that Sims had threatened Silas' life the day before. Now hear his statement made in presence of Sims. He was called in by Alston, and asked to state what threats he had ever heard. He replied, that the only threat he had ever heard Sims make was, that if he caught Silas prowling about his negro quarters at night, he must abide the consequences. This does not correspond to his statement to Bankstone. If he could state to Bankstone, that such a threat had been made, when it was untrue, does it not prove, that threats had been the subject of conversation between Keithler and Silas? and we shall see hereafter that such was the fact.

The testimony of Mount proves, that Keithler wished to give a false coloring to the affair. Mount, on Thursday evening, spoke of the murder, as being a cruel and unprovoked one. Keithler remarked that the affair was not so horrid. The witness was surprised at the reply, and asked Keithler, if he had heard any threats. He answered, that Sims had threatened, that if he ever caught Silas on the plantation, he would shoot him. The witness asked, if the threat was not, that if he ever caught Silas prowling about his negro quarters at night he would shoot him. He replied that such was not the threat. At this moment, Keithler was called into the presence of Sims by Alston, and asked what threats he had heard, when he gave an answer differing from his statement to Mount, but a few moments before. To Mount he wished to palliate the offense, but was forced to tell the truth in presence of Sims.

The testimony of A. Jones is also entitled to much weight, as he relates facts substantially as Silas has done. On the evening that Sims was killed, he went to the mill, and shortly afterwards Silas rode up; they had some conversation at the mill, in which Silas told him he expected to have some difficulty with Sims. Witness went up into the mill where Keithler was; Silas

soon followed, but remained only a short time, when he returned to the mill, and beckoned to Keithler, who went to him, and they held a conversation together. Silas related the fact very much in the same way, and said that the murder of Sims was the subject of conversation, and in an hour afterwards it was accomplished.

The testimony of young Dewson, who lived at the mill, is also important. Keithler and Silas slept together in the same room with the witness, and were generally together, and held many private conversations. On one occasion, when Keithler and Silas were lying under a shed together, he heard Silas say, " It will be all right to-morrow," when Keithler answered, " You have promised that frequently, and it is not done yet." This occurred on Tuesday night. Silas mentions the circumstance, and says the answer had reference to the murder of Sims. This young man also heard Silas remark, late at night whilst in bed, " Somebody has promised me a horse and bridle to kill or beat Sims." This witness establishes beyond doubt a very close and confidential intimacy between Keithler and Silas. Such as to render it more than probable that Silas had communicated his design to Keithler, even if he had conceived the plan without Keithler's aid or advise. But when the other circumstances are considered, it is difficult to resist the conclusion that the prisoner was an adviser in the scheme.

We shall close our remarks on the testimony with that given by Amos R. Johnson. Silas sent for him to the jail, and wished him to appear for him before the court of inquiry. He stated, that Sims had threatened his life, and he could prove this by Keithler. Johnson went in search of Keithler, and after some time met him coming from towards the jail, where he had probably been to see Silas. In answer to Johnson's inquiries he stated, that he could prove the threats, but did not wish to testify before the committing court, for fear it might give offense to Mrs. Sims. He wished to wind up his business at the mill, and would testify before the circuit court, and his testimony would clear Silas. He was subpœnaed but did not attend. An attachment was taken out for him, and about the same time he was arrested on the charge and brought to town. Standing

under a tree, he beckoned to Johnson, and said to him : " They had me up before Sims the other day and examined me, but that was not a court, and I was not bound to state the truth there." On the examination Keithler was introduced as a witness for Silas, but did not testify as he had told Johnson he would, when Silas, springing up from his seat, propounded this question, " Henry, did you not tell me at the mill, on Tuesday evening, that Sims had said that day, ' that he would kill me on sight, without giving me time to wink ?' " After some hesitation, the prisoner replied, " Why, Silas, you know that is not so." Silas, under excitement, repeated the question, and Keithler denied that he had so told him at the mill, but said that Sims had that day (Tuesday) used the expression, " I will kill Silas on sight, without giving him time to wink." Now, let it be borne in mind, that Sims was killed on Wednesday, or rather the wounds were then inflicted. Silas testified that Keithler had communicated threats on Tuesday. Keithler told Bankstone that Sims had threatened Silas' life the day before (Tuesday). Silas, in the manner above stated, asked him if he had not told him at the mill of Sims' threat. Keithler at first denied, but subsequently stated that Sims had made such a threat. Can any other conclusion be drawn from these circumstances, than that Keithler had made false representations to Silas, and that with a view to induce him to perpetrate the crime. There is something in the testimony of every witness that was examined, that tends to fortify the testimony of Silas, and when every circumstance is duly weighed, his testimony is corroborated as to the guilt of Keithler. We have entered into this investigation of the evidence, to show that Silas was not entirely unsupported in his statements. Whilst there were powerful reasons to question his credibility, the verdict was not given without corroborating evidence, and must stand.

Judgment affirmed.

After the delivery of the foregoing opinion, Messrs. *Davenport* and *Wharton* filed an elaborate petition and argument for a re-argument of the cause, which was refused, and the following opinion delivered by SHARKEY, C. J. :

The judgment of the circuit court in this case was affirmed on a former day of the term, and an application has been made for a re-argument which is based upon supposed errors in the decision. The points relied on for a re-argument have been discussed at some length, and the benefit of a re-argument has thus virtually been had.

The accused had been convicted of murder, and we were reluctantly compelled to affirm the judgment. The magnitude of the case had its due weight in the original investigation. Every point made in the record was very fully and deliberately considered by each member of the court. We should not, of course, have pronounced the judgment without being entirely satisfied of its correctness. No new questions are presented, and we have examined again the points pressed for a re-argument, and regret to say, that we find no reason for changing our opinion. On the contrary, we are strengthened in the conviction which induced us to affirm the judgment, and on that account do not regret that a petition for a re-argument was presented. The grounds relied on will be briefly noticed.

It is again insisted that the indictment was defective, because it was signed by a district attorney *pro tem.*, who had been appointed by the court. We held, the court had the power to make the appointment, and think so still. We did not then wish to take the ground that no signature to the indictment was necessary save that of the foreman of the grand jury, preferring to sustain the practice as it has existed in accordance with the statutes on that subject. But we now remark, that we know of no law in this state which requires the signature of the district attorney to an indictment. The common law certainly does not; and if there be no statute which does, then it is not required at all. An indictment derives its validity by the endorsement of the grand jury, " a true bill," over the signature of their foreman. Thacher's Crim. Cases, 284 ; Archbold's Crim. Plead., 58 ; 1 Chitty's Crim. Law, 316–324.

The case of The State v. Byrd is supposed to sustain a different doctrine. It was there remarked that it was the duty of the district attorney to sign the indictment ; but it was not said to be an indispensable duty. The question was not involved, and

the remark was only made in argument.  With great propriety
the same remark might be made again.  It has been the invariable
practice for district attorneys to sign indictments, and we still
think it a correct one.

A case in 9 Yerger has been cited.  The decision seems to be
predicated on a practice, which has grown out of their statute.
No indictment is permitted to go to the grand jury, unless the
district attorney, after a conference with the prosecutor, shall
recommend it.   Statute Laws of Ten., 385.

The same objection was taken to an indictment in North Car-
olina, and the court decided the point directly, that it was not
necessary that the prosecuting attorney should sign the indict-
ment.   That the common law did not require it, and there was
no statute which did.   If it was not necessary that this indict-
ment should be signed, of course a useless signature did not
vitiate it.   Carolina Law Repository, 493.

The second point is, that Silas was improperly permitted to
testify, because the statute only renders competent one who has
been convicted, but not one on whom judgment has been pro-
nounced.  We adhere to our construction of this statute.   Judg-
ment amounts to conviction, and conviction of felony and other
crimes disables a man to be juror, witness, etc.   Tomlin's Law
Dictionary, 414.   See also, Roscoe's Criminal Evidence, 123.
We cannot doubt but that the legislature used the word " con-
viction" in its broadest sense, as one under judgment.

The third ground taken is, that the following charge was erro-
neous, to wit : " It makes no difference to the merits of this case,
whether Silas conceived the design to kill Sims, before his inter-
view with Keithler, or not.   If Keithler encouraged him in that
design, by falsely stating to him threats of Sims, Keithler is
guilty."   We are always to consider of charges in connection
with the evidence before the jury.   We do not understand the
language of this charge, as conveying the idea that it is sup-
posed to embrace.   If Keithler was ignorant of Silas' design,
then he could not be said to have encouraged him in that design.
A knowledge of the design is therefore implied in the language
used.   So, at least, we understand it.   The idea which the
charge seems to us to convey is this : It is not material that

Keithler should have originated the design. If Silas had previously formed it, and Keithler encouraged him to carry it out, by stating falsehoods or otherwise, he is guilty. The court said to the jury, "if Keithler *encouraged him in that design.*" In what design? The design of killing Sims. This identifies Keithler with the design of course. If Keithler had merely stated falsehoods, without knowing of the design, he could in no sense be said to have *encouraged that design.*