GEORGE (A SLAVE) v. STATE, 39 Miss. R., 570.

HOMICIDE.

In point of law there can be no objection to the insertion of several distinct felonies of the same degree in the same indictment against the same offender. And if the joinder of more than one distinct felony in the same indictment be objected to before plea, the court should quash the indictment. But this is a matter within the discretion of the court, and not necessarily a right of the accused. *Semble*, that such objection cannot be made after plea of not guilty.

By the express terms of Rev. Code, 497, art. 126, a person who is an alien is disqualified to act as a juror in any case; yet if his disability was not made known to the court, and the defendant accepted him at the time, knowing the existence of such disability, it will be presumed that all objections were waived; and the juror having sat in the case will not vitiate the verdict. 2 Bay, 153; 2 N. & McC., 261; 4 Dall., 353.

Where there is a conflict in the testimony of two witnesses, it is within the province of the jury to decide which of them is entitled to credit.

Error to Bolivar circuit court. YERGER, J.

The plaintiff in error and one Josephine, both slaves, and belonging to La Fayette Jones, were jointly indicted for murdering, by poisoning, Lelia Virginia Jones, who, at the time of her death, was about eighteen months old. There were two counts in the indictment; the first charging both parties as principals, the second charging Josephine as principal, and George as accessory before the fact.

On motion of the state, a severance in the trial was granted; and George, having been put on his trial, moved the court to quash the indictment on account of misjoinder of the two counts; which being overruled, he moved the court to compel the district attorney to elect on which of the counts he would proceed to try him. This motion was also overruled.

On the trial it was proven for the state by La Fayette Jones that he had owned George about twelve years; that for the last two or three years he had been an invalid and had not worked in the field, but had done little jobs about the house and yard; that on the Sunday last preceding the poisoning he had ordered his overseer to direct George to go to laying off corn-rows on the next morning; but George, being sick next morning, was not put to work as directed; that on the 27th of February, 1857, about noon, he and his wife and little daughter, Lelia Virginia Jones, and his son and a Mr. Forbes, ate dinner at his res-

idence; that he (witness) and Mrs. Jones and Lelia Virginia Jones drank tea; that Lelia was taken sick at the table, and, in ten or fifteen minutes after dinner, he and his wife were taken violently ill, all of them vomiting a great deal; that he had burning and retching about the stomach, and all three of them high nervous excitement; his son and Forbes did not drink of the tea, and were not sick; that Lelia kept growing worse, and died that night, about ten o'clock, from the attack, at his residence in Bolivar county, state of Mississippi.

On cross-examination, he stated that George had always been a good and obedient and humane servant; that he had purchased said Josephine but a few weeks previously, in New Orleans; that she seemed a good deal dissatisfied about the purchase; she was the cook who prepared dinner on the day of the poisoning, and had been acting in that capacity for about a week; that on that morning she had been impudent to his wife, for which he had given her a slight whipping, and the overseer had also whipped her for the same offense.

Mrs. Jones, for the state, testified in regard to the poisoning and its symptoms the same as her husband. She stated that she had taken only a few sups of the tea, and that her little daughter Lelia had drank a whole cup-full. She stated that tea was not usually prepared for dinner, but only when it was specially ordered, and that she did not remember having ordered tea for dinner on that day. She also stated that she had gone to the smoke-house with Josephine to get out dinner, and Josephine did not then appear to be in a bad humor; but that after the whipping in the morning, she was morose and sulky; that in the last two or three days before the poisoning, Josephine's manner had changed.

Both the above witnesses stated that it was no part of George's business to be in and about the kitchen, and neither of them remembered to have seen him there on the day of the poisoning. Mr. Jones stated he was engaged at work fixing up the palings around the yard.

John Rhodes, for the state, testified that he was overseer for La Fayette Jones in 1857; that on Sunday previous to the poisoning he told George to go to laying off corn-rows next

morning; that his master had so ordered. George said he was sick and not able to work; that his master was tighter on him than ever before, and that witness was the cause of it. George did not refuse to lay off the corn-rows, but grumbled, not more than negroes who had been indulged a good deal usually do. George was sick next morning—had fever—and was not put to laying off corn-rows, and never had been put to that work. George was a negro of good character for fidelity and obedience.

Dixon, for the state, testified that he was overseer for L. Jones in 1854 and 1855. In the year 1854, George told witness he had found a vial with some white stuff in it, and asked witness what he should do with it. George, while under witness' charge, was of good character for truth, fidelity and obedience.

Dr. Mason, for the state. Visited Jones and wife and the deceased professionally on the evening of the poisoning. He described the symptoms of the attack under which they were laboring, and stated that they were such as were commonly produced by arsenic, and that the child died from the effects of it that evening, soon after his arrival there.

The state then introduced Josephine, who was jointly indicted with George, as a witness. The defendant objected on account of her incompetency. The objection was overruled, and the defendant excepted. She then testified that about a week before the poisoning she went, about nine or ten o'clock at night, to George's cabin to carry him his supper. George said he was sick, and that the overseer had ordered him to lay off corn-rows next morning, and that he could not do it; that his master was getting tighter on him than he had ever been, and that the overseer was the cause of it; that it was his master's day now, but it would be his after awhile; that he was going to take care of number one. He spoke in his usual tone of voice. George then got up and went to his chest, without saying what he wanted. After looking about in his chest some time, he took out a vial and showed it to witness, and said it was ratsbane or strychnine, he did not know which, and that he would have use for it after a while. Witness could read a little, and seeing a small part of a label on the vial, endeavored to read it, and thought

she could make out " arsenic." George put it back in the chest. There was a little negro girl called Eliza in the cabin at the time, but does not know in what part of the cabin she was; thinks she was at the fireplace cooking her supper. On the day of the poisoning, George came into the kitchen a short time before dinner. The dishes were on a table to the right of the stove. George said he wanted to take some medicine, and asked for a spoon. He reached up and got one. After a short time he reached up as if to put something on the plate or joist of the kitchen, and said: " Don't let anybody disturb this." Witness had her back to George most of the time, and did not see him put anything into any of the dishes or vessels. Tea had not then been made. There was a teakettle on the stove, and a teapot on the table with the dishes. George was about five feet from the stove, and near the table on which the dishes were placed. When George asked for the spoon she told him he knew where to get it, and not to bother her. There was water in the kettle, but none in the teapot. Maria (a small negro girl) afterwards poured water on the tea in the teapot. After the poisoning, Mr. Rhodes, the overseer, arrested her and tied her to a bed in a room between the dining-room and parlor. There is a door with a broken pane of glass in it; and shortly after her arrest George came to the door and spoke to her through the broken pane, and asked her if she had removed that bottle from where he had put it. She told him she had not removed it, and knew nothing about it. She asked him if he had put anything into the dinner. He said, " Not enough to hurt," and then said he would go and destroy the vial. Shortly afterwards he came round to the window at the other end of the room, and told her he had thrown the vial into the fire and destroyed it, and said : " For God's sake, say nothing about it." The window-sash was pushed up a little way, and a book placed under it, and witness saw George when he came there. She had been sitting on a chair, but rose up when he came.

Cross-examined.—After the poisoning Mrs. Jones directed her to bring in a tub of warm water, which she did, and then, by direction of Mrs. Jones, went into the ironing-room to iron a dress. She was there when arrested. Before dinner, when

going to Mary's room for dishes, she saw one of her handkerchiefs there, which seemed to have been used in straining starch. She took the handkerchief to the kitchen, and shortly before dinner, washed it and hung it on a bush to dry. She had not, to the best of her recollection, told Judge McGuire or Dr. Mason, on the evening of the day on which the poisoning took place, "that she had seen George put something in the teapot and stir it up." She was confident she had not told them so. She said when she saw the vial at George's cabin she thought of no harm. She had never told Dr. Mason that she and George had conspired to poison Jones' family.

Eliza, a slave, for the defense, testified that she was in George's cabin cooking her supper when Josephine came in; this was the night before the poisoning. Some time after Josephine came, George went to his chest, as he said, to look for some tobacco. After rummaging about for some time, he picked up a vial and said to Josephine, "Here is some stuff, either ratsbane or strychnine." Josephine said, "Let me look at it, Uncle George." She took it and tried to spell out some name on a paper of the vial, and said it was arsenic, and handed it back to Uncle George, who said he did not want it, and had no use for such stuff. Josephine then asked him for it, and took it and put it in her pocket. George said he had found it in the road, and had had it for a long time.

Cross-examined.—She did not sleep in the cabin that night; she came there to cook her supper. George looked in the chest some time for the tobacco; he came from the chest with the vial in his hand. Witness had her back to George when he first went to the chest, but had turned round when she saw him with the vial; she was near enough to hear distinctly what was said. Heard George say to Josephine that his master was getting tighter on him than he had been; that Mr. Rhodes was the cause of it. He did not appear to be angry. Said he was not able to lay off corn-rows. Did not hear him say that his master had had his day, and he would have his, nor that he would take care of number one. Had heard George the Sunday night before speak of his master wanting him to lay off corn-rows, and that he was getting too tight on him. She stayed in the cabin

about an hour that night. George and Josephine had been sleeping in the cabin about two weeks.

Maria, a slave, about eleven years of age, for the defense, testified that on the day of the poisoning, shortly before dinner, she went into the kitchen and saw Josephine straining something through a handkerchief into the teapot; the handkerchief was wet. She had one hand in the pot, and was squeezing something. Josephine afterwards washed the handkerchief by pouring water from a gourd, and then hung it on a bush behind the kitchen. Witness told this on the night of the poisoning to Dr. Mason, who told her to go and get the handkerchief, which she did, and gave it to Dr. Mason or Judge McGuire. When witness first went into the kitchen, Josephine told her to go and ask her mistress if she wanted tea for dinner. Witness went, and came back and told Josephine that her mistress said make tea. It was on her second going that she saw Josephine washing the handkerchief. She went with Josephine to get the tea. Saw her hang out the handkerchief when she went back to tell Josephine to make tea. When sent by Dr. Mason, she found the handkerchief on the bush where Josephine put it; the handkerchief was a white one.

Being cross-examined, she stated that she saw Josephine squeezing the handkerchief into the teapot when she was going to ask her mistress if tea should be made; then she stated that she saw Josephine squeezing the handkerchief when she went with Josephine to the store-room to get the tea; and afterwards stated that she saw her washing the handkerchief at the kitchen door when she was returning from the house with the message to Josephine to make tea, and *then* she saw Josephine hang it on the bush from which witness afterwards took it. Witness said that none of the negroes on the place, nor her master nor mistress, had ever talked to her about the poisoning since it occurred.

Raney, a slave, for the defense, testified that on the morning after the poisoning witness went into the room where Josephine and George were tied; talked with Josephine, and charged her with the poisoning. Josephine said, "You all make more fuss than the white folks. I am not the first that has done such a

thing by ten thousand." Josephine said nothing about George. Becky and Abram were present.

Abram, a slave, for the defense, testified that on the morning after the poisoning he saw Josephine in the house, when Becky and Rancy were there, and heard Josephine say what was testified to by the witness Raney.

Becky, a slave, testified the same as the two last-named witnesses, and stated further that Josephine said that if she could call back yesterday for to-day she would do it, but it was too late. She said, "I did not tell Uncle George to give me the strychnine; if you can all clear George by talking, do it." Witness had been George's wife seven or eight years before; lived with him two or three years; had no children by him. Witness is the mother of witness Maria, who usually slept in the dwelling-house.

Dr. Mason, for the defense, testified that on the night of the day on which the poisoning took place he talked with Josephine. She was then tied. She said "she did not do it; that George came into the kitchen and asked for a spoon; she was standing in another part of the kitchen: thought he was going to take medicine; had her back to him; turned round and saw George stirring in the teapot. He then reached up to the plate of the house on which the rafters rested, and said, 'I'll lay this up there; don't disturb.' She understood him to mean the vial." Witness then took her into her room, and asked her if she and George had not conspired to poison the family. She said they had; but that she did not know that George was going to do it. Witness asked her where the poison was. She said she did not know. Witness asked again. She said she could tell where George said it was, and that George said it was thrown into the fire in Mr. Forbes' room. Witness then went into that room and found in the fire-place the fragments of a vial, the glass being a little fused; the fire must have been burning at the time it was thrown in. Witness heard, on the night of the poisoning, witness Maria say she had seen Josephine strain something through a handkerchief into the teapot, and then wash the handkerchief and hang it out on a bush behind the kitchen. Witness directed Maria to bring the hand-

kerchief to him; she brought a white linen handkerchief, which appeared to have been recently washed, and not ironed. ·

Cross-examined.—Witness stated that Josephine, when first examined, exonerated herself, and tried to throw it all on George. Witness did not see George that day until shortly after his arrest; he did not then exhibit any alarm, and appeared natural, just as he does now. This was between ten and eleven o'clock at night. Witness, in order to induce Josephine to tell all she knew, promised to get her off on a steamboat and save her. This promise was made to her before she made any confessions.

Lafayette Jones, for the defense, testified that his house is placed on blocks three or three-and-a-half feet high. The window spoken of by Josephine, and to which she said George came the second time to speak to her, is eighteen inches or two feet from the floor. Does not think one standing on the outside by the window could be seen by one within, and at the foot of the bed, where Josephine was tied sitting in a chair; the head of the outside person might be seen by a person standing up at the foot of the bed.

Judge McGuire, for the defense, testified that he was father-in-law of Jones, and went to his house on the evening the poisoning took place, and talked with Josephine. She told him that George came into the kitchen and wanted a spoon, as he said, to take medicine. She was accustomed to his taking medicine. The stove was in the middle of the room, and she was on one side, and he on the other. He got a spoon, and put some white stuff in it, and put it in the teapot; he then laid the vial on the plate or joist of the house. Witness further stated that witness Maria told him and others that she saw Josephine strain something into the teapot, through a white handkerchief; that she saw Josephine wash the handkerchief and hang it out to dry on a bush. Maria said this in the presence of Josephine. Dr. Mason then told Maria to bring the handkerchief, which she immediately did. It had the appearance of having been recently washed, and not ironed. Josephine first denied all knowledge of it, but afterwards said it was hers. George was about the yard when he was arrested. Josephine told him and

others that witness Eliza saw George give her a vial. Eliza being interrogated, said she had seen George give Josephine the vial.

This was all the testimony for the defense. Thereupon the state, after having proven that the identical handkerchief before referred to had been delivered to Professor W. D. Moore, and in the same condition as when produced by Maria, introduced Moore as a witness, who testified that he cut parts of the handkerchief, as follows: a square in the centre of the handkerchief, in size about equal to the border on all sides remaining after the square was cut out, and also cut out strips running from the corners of said square to within a short distance of the adjacent corners of the handkerchief. These strips were two and a half inches wide. He submitted the pieces so cut out to chemical tests, and he found a great deal of starch in them, and found no trace or sign of arsenic. He had employed such tests as would certainly have discovered arsenic if it had been filtered through the handkerchief on the 29th of February, 1857, and afterwards washed, as stated by the witness Maria. He also submitted the remainder of the handkerchief to chemical tests, and discovered starch in it, but that he had not applied to it any chemical test which was used for discovering arsenic. He gave a detailed statement of the tests applied, and how he applied them.

The court then instructed the jury in behalf of the state as follows:

1. A prisoner may be convicted on circumstantial evidence as well as on direct and positive testimony. Great care and caution should be used by the jury in the investigation of such evidence. When, after due care and caution in the investigation of circumstantial evidence, a full conviction on the minds and consciences of the jury of the guilt of the accused, to the exclusion of all reasonable doubt, is produced, the law authorizes the jury to act upon it. Circumstantial evidence, which satisfies the minds and consciences of the jury, to the exclusion of all reasonable doubt, is sufficient to justify a conviction. Absolute demonstrative certainty is not essential to proof by circumstances; it is sufficient if the circumstances produce moral certainty, to the exclusion of all reasonable doubt. The legal test

of the sufficiency of evidence, either circumstantial or direct and positive, to authorize a correction, is its sufficiency to satisfy the understanding and consciences of the jury, to the exclusion of all reasonable doubt of the prisoner's guilt."

2. To authorize the jury to find the prisoner guilty, there should be evidence before them sufficient to satisfy their minds of his guilt beyond a reasonable doubt; that which amounts to mere possibility only, or conjecture, or supposition, is not what is meant by a reasonable doubt. The doubt which should properly induce a jury to withhold a verdict of guilty should be such a doubt as would reasonably arise from the evidence before them.

3. If the circumstances in the case proven before the jury satisfy their minds of the guilt of George, as charged in the indictment, to the exclusion of every reasonable doubt arising from the evidence before them, and are sufficient to satisfy their minds and consciences, to the exclusion of every reasonable doubt of his guilt, as above explained, they will find him guilty as the indictment charges.

4. The testimony of the girl Josephine is competent legal testimony for the consideration of the jury, and is to be as fully weighed and considered as any other testimony in the cause, but may be impeached or disregarded by the jury if, from her situation as a joint defendant, or other facts and circumstances connected with her testimony, or her interest or bias in the result of this case, the jury should believe her not entitled to credit. The jury can, however, receive the whole of her statement as true, if they believe it, or reject it if they do not believe it, or receive a part or reject a part, as they believe it to be true or false.

5. If the jury believe from the evidence before them, beyond all reasonable doubt arising in the case, that George administered the poison himself, or aided and abetted any other person in anywise in the administration of the same, and thereby caused the death of the person, as charged in the indictment, they are bound to find him guilty.

6. That if the jury believe from the evidence, beyond all reasonable doubt arising in the case, that George was not the party who actually administered the poison through the tea, but had a

guilty knowledge and participated in the administration of the same, or if he was cognizant of the administration of the same, and aided and consented thereto, he is to be regarded as a principal in the poisoning, and they must convict him.

7. If the jury believe the testimony of Josephine to be entirely true and entitled to credit, and are satisfied beyond a reasonable doubt, from that testimony and other facts detailed in the evidence, of the guilt of the defendant George, they may convict on the testimony of the said Josephine, and upon the said facts detailed by other witnesses, or upon the testimony of said Josephine alone, if they believe it to be true, and it establishes the guilt of the accused of the offense charged.

The following instructions were asked by defendant, but refused or modified as follows:

1. The court instructs the jury that, before they can find the prisoner guilty on circumstantial proof, that proof must be so absolute, conclusive, positive, and certain, as to exclude from their minds every other reasonable *supposition or belief.*

This instruction was modified by striking out the words in italics, and adding "hypothesis or probability arising from the evidence in the case but that of the prisoner's guilt."

2. That to justify a conviction on circumstantial evidence, it is necessary that the circumstances should be such as to exclude to a moral certainty any other *supposition but that of the prisoner's guilt.*

This instruction was modified by striking out the words in italics, and adding the same words as were added to the first instruction.

3. Whenever circumstantial evidence leaves it indifferent which of several hypotheses is true, or merely establishes some finite probability in favor of the hypothesis of guilt rather than another, such evidence cannot amount to a legal proof of guilt, however great the probability may be.

This was modified by inserting after the word "hypotheses," in the second line, the words, "arising from or growing out of the evidence and the facts and circumstances detailed in proof."

4. If there be any fact established by the evidence in the case which is irreconcilable with the hypothesis of the prisoner, the

jury must acquit, although all the other facts and circumstances of the case may agree with the hypothesis of guilt *to the minutest extent.*

The court modified this instruction by striking out the words in italics.

The fifth instruction, as asked, is printed in italics, the modifications made by the court are printed in italics, as follows:

5. In order to justify the inference of legal guilt from circumstantial evidence, the inculpatory *or criminating* facts must be absolutely incompatible with the innocence of the accused, and incapable of explanation upon any other reasonable hypothesis *arising from the evidence, or growing out of the proof in the case,* than that of his guilt.

6. If the jury have a reasonable doubt of the guilt of the prisoner, *however small that doubt may be,* if it arise from the testimony they must acquit.

This was modified by striking out the words in italics.

The seventh instruction as asked is printed in Roman letters; the modifications of the court are printed in italics, as follows:

7. That though the testimony of Josephine was competent and admissible, yet *she being a party jointly indicted with the defendant,* it should be received *and considered* with caution; and in weighing it the jury have a right to, and should take into consideration her situation, and the temptation *she may have* to swear falsely, and give it such consideration as they may deem proper. They have the right to disregard it altogether *if they disbelieve it, or do not deem it entitled to credit,* or take such parts of it as may be consistent with the other testimony in the cause, *or they may receive and act upon the whole of it if they believe it to be true and entitled to credit.*

The eighth, ninth, and tenth instructions, as asked and modified by the court, are printed in the same manner as the seventh, as follows:

8. That if a witness has made statements out of court which he or she denies under oath in court, the jury may discredit her or her testimony altogether *if they disbelieve it or do not deem it entitled to credit, or they may act upon the whole of it,* or

take such portions of it as may be consistent with the other proof in the cause, *if they believe it to be entitled to credit.*

9. That in order to discredit the testimony of a witness, it is not necessary to produce witnesses to swear that they would not believe him or her under oath. The manner of a witness in testifying, his or her situation, and motives to commit perjury, *if any such appear in the case,* proof of his or her having made statements which on examination he or she has denied under oath, may be all taken into consideration as affecting his or her credit; *and if upon so considering the testimony of the witness the jury do not believe it to be entitled to credit, they,* the jury, may disregard, either in whole or in part, the testimony of such witnesses.

10. That the jury are the exclusive judges of the sufficiency of the testimony; those circumstances under which a witness may testify before them, the incentive to falsehood, the direct interest which they may have in the conviction *of the party against whom the witness testifies,* as well as the character of the witness, are circumstances to be weighed by the jury; and if they believe from the evidence that such inducements were present, and operated on the mind of the witness Josephine when she testified before them as induced her to testify falsely, or should discredit her testimony, her statements not corroborated *by other testimony in the cause* should be disregarded altogether, and such statements as are corroborated *by other testimony in the cause* should have such weight as the jury may think them entitled to, *in consideration of them with the other testimony in the cause.*

The prisoner was convicted of murder, and thereupon he moved for a new trial on the following grounds:

1. Because Walker, one of the jury who tried defendant, was an unnaturalized foreigner at the time.

2. The jury found contrary to law and the evidence.

3. The court erred in instructing the jury.

In support of the first ground of the motion, the defendant read the affidavit of Walker, one of the jury, who swore that at the time of the trial he was an unnaturalized foreigner, and not a citizen of the United States; also defendant's own affidavit

and that of his counsel, in which it was denied that they knew of Walker's disqualification as aforesaid.

The motion was overruled, and the defendant excepted and sued out this writ of error.

*Brooke* and *Smedes*, for plaintiff in error.

The court manifestly erred in the several modifications of the defendant's instructions. All of these instructions, as asked by the defendant, are couched in the language of the law as sanctioned by this court in several cases. McCann v. State, 13 S. & M., 471; Cicely v. State, ib., 202; Browning v. State, 30 Miss., 656. The court may change or modify an instruction so as to make it conform to the law. (Boles v. State, 9 S. & M.) But if the instruction is in conformity with the law, as asked, it is error to change or refuse it. Lambeth v. State, 23 Miss., 322.

Those instructions in relation to the credibility of certain witnesses, were erroneously modified. It is undoubtedly true that, under the benign rule of the law, a prisoner has the benefit of any doubts in the testimony of any witness against him, especially when such witness' testimony conflicts with other testimony in the cause. So was also the sixth instruction erroneously modified. The prisoner is, undoubtedly, entitled to the benefit of any reasonable doubt arising from the testimony, however small that doubt may be. By changing this instruction, the court undertook to measure the quantity of such doubt, and which left an unfortunate impression on the minds of the jury.

The indictment should have been quashed, or the district attorney compelled to elect on which count he would proceed. Brantley v. State, 13 S. & M., 468.

The court should have granted a new trial, for the reason that one of the jurors who tried the cause was an alien. This was proven by the affidavits of the juror himself, and also it was shown by the affidavits of the prisoner and his counsel that the fact was not known to either of them before the verdict. Seal v. State, 13 S. & M.

*T. J. Wharton*, attorney general.

1. There was no error in refusing to quash the indictment, or in refusing to compel the district-attorney to elect on which count of the indictment he would try the defendant. Brantley v. State, 13 S. & M., 470; Norris v. State, 33 Miss., 373; Strawhern & Grizzle v. State, 37 Miss., 42; Wash v. State, 14 S. & M., 120; Sarah's case, 28 Miss., 274; 8 Wend., 203; 12 ib., 425; 12 Pick., 1; Wharton's Am. Cr. Law, 149, *et seq.*

2. The competency of an accomplice as a witness against the principal is well settled. Wharton's Am. Cr. Law, 301; 10 S. & M., 192.

3. The fact that Walker, an unnaturalized foreigner, sat on the jury, is no ground for reversal, so long as it appears that no objection was made to him at the time he was sworn. Seal v. State, 287. Then was the time, and only time, when the inquiry could come up; and defendant waived the objection because he failed to make the inquiry as to Walker's qualifications at the proper time. Williams v. State, 37 Miss., 409.

SMITH, C. J.:

The plaintiff in error and Josephine, who are slaves, were jointly indicted in the circuit court of Bolivar county for the murder, by the administration of poison, of Lelia Virginia Jones. The indictment contained two counts. In the first, the parties were charged jointly as principals; and in the second, Josephine was charged as principal, and the plaintiff in error as accessory before the fact. Upon the application of the district attorney, and with the consent of the counsel, the plaintiff in error was tried separately, and convicted of the murder.

Before proceeding to trial, the plaintiff in error moved to quash the indictment upon the ground that there was an improper joinder of counts; which motion being overruled, he moved the court to compel the district attorney to elect as to which of the counts in the indictment the prisoner should be tried on. This motion was also overruled, and this action of the court is made the first ground of exception to the judgment.

The rule on this subject is well settled in this court. It is held that, in point of law, there is no objection to the insertion

of several distinct felonies of the same degree in the same in-
dictment against the same offender. And if the joinder of more
than one distinct felony in the same indictment be objected to
before plea, the court will quash the indictment, lest it should
embarrass the prisoner in his defense, or prejudice him in his
challenge to the jury. But this is not regarded as a right,
strictly speaking, of the accused, but as a matter submitted to
the discretion of the court, which it may exercise as a measure
of prudence for the safety of the accused.[1] Wash v. The State,
14 S. & M., 120; Sarah v. The State, 28 Miss. R., 267.

The court, therefore, committed no error in refusing to quash
the indictment for the alleged reason, or in refusing to compel
the district attorney to elect as to which of the counts in the in-
dictment the prisoner should be tried on. Moreover, the court
had no discretion in the case. The motion for either purpose
was made too late. The prisoner had been arraigned, and had
pleaded to the indictment, before either the motion to quash the
indictment, or to compel the district attorney to elect, was in-
terposed.

During the progress of the trial, Josephine, the party jointly
indicted with the plaintiff in error, was tendered as a witness in
behalf of the prosecution, and was objected to upon the ground
of incompetence. The objection was overruled, and the de-
fendant took his exception.

This ruling of the court is assigned for error; but as the point
has not been pressed in the argument of counsel, it is sufficient
to remark that in this respect no error was committed.

[1] State v. Crank, 2 Bailey, 66; 1 Chitty Cr. Law, 252, 253; Kane v. People, 8 Wend.,
203: 12 ib., 455; Wharton's Am. Cr. Law, 414, 415; Carlton v. Commonwealth, 5
Metc., 532; Moody v. State, 1 W. Va., 337; State v. Hood, 51 Me., 363; Cory v. State,
3 Port., 186; Stone v. State, 1 Spencer, 404; Rex v. Ferguson, 29 Eng. C. L. R., 536;
Baker v. State, 4 Pike (Ark.), 56; People v. Rynders, 12 Wend., 425; Edge v. Com.,
7 Barr, 275; Coulter v. Com., 5 Metc., 532; State v. Kirvy, Miss., 317; Mills v. Com.,
1 Harris, 631; Hoskins v. State, 11 Geo., 92; Engleman v. State, 2 Carter (Ind.), 91;
U. S. v. O'Callahan, 6 McLean's C. C. R., 569; Johnson v. State, 29 Ala., 62; Orr v.
State, 18 Ark., 540; Com. v. Tuck, 20 Pick., 356; State v. Brady, 14 Vt., 353; State v.
Crocker, 3 Harr. (Del.), 554; State v. Grisham, 1 Hayw., 12; Josslyn v. Com., 6 Metc.,
236; State v. Flye, 26 Maine, 312; People v. Austin, 1 Parker's Cr. R., 154; State v.
Patterson, 1 W. & M., 305; Com. v. Manson, 2 Ashmead, 131; McGregg v. State, 4
Blackf., 101; State v. Coleman, 5 Porter, 32; Wash v. State, 14 S. & M., 120; People
v. Baker, 3 Hill, 159; State v. Hogan, Charlton, 474; Carlton v. Com., 5 Metc., 532; 1
Archbold's Cr. Pr. and Pl., 95; Rex v. Jones, 2. Camp., 131; Rex v. Johnson, 3 M. &
S., 539; Young v. Rex, 3 T. R., 98; Rex v. Towle, 2 Marsh, 466; Rex v. Galloway, R.
& M. C. C. R., 234; 2 Leach C. C., 1105, n.

Numerous exceptions are taken to the granting of certain instructions asked in behalf of the prosecution, and to the action of the court in modifying those requested by the defendant.

Without noticing these exceptions in detail, we deem it sufficient to say that, after a careful and critical examination of the charges given for the state, and of the instructions as modified and given for the defendant, that in no single instance has an error been committed of which the plaintiff in error has a right to complain.

The remaining exception refers to the judgment of the court on the motion for a new trial.

First, it is insisted that a new trial should have been awarded for the reason that one of the jurors who returned the verdict was an alien, and hence not a qualified juror, according to the law of this state; and, secondly, because the evidence was not sufficient to authorize a conviction.

1. It appears, from the evidence in this case, that one C. A. Walker, who was summoned as a juror in this case, after examination by the state, was tendered to, and excepted by, the prisoner as a juror. It also appears, from affidavits filed in support of the motion for a new trial, that said Walker was at the time an unnaturalized foreigner, and that this fact was unknown to the prisoner or to his counsel until after the rendition of the verdict.

By the express terms of the statute, Code, 497, art. 126, the said Walker was disqualified to act as a juror in the case, and would, hence, have been set aside, if his want of qualification had been made known to the court, unless the objection had been waived by the defendant. The question, then, here to be considered, is, whether the plaintiff in error, who had it completely in his power to ascertain whether the juror tendered to him was not disqualified, must not be held to have waived the objection.

The statute is careful of the rights of parties capitally charged. It has provided efficient means to secure to them a fair trial by an impartial jury of their country. To this end a special *venire* is awarded, to be drawn from a list of the names of the qualified jurors of the county; and the party to be tried

is entitled to be served with a copy of the *venire* one entire day before he can, without his consent, be put upon trial. The object of this is, manifestly, to afford him an opportunity to ascertain not only whether the jurors summoned are legally qualified, but what are their dispositions and feelings in regard to himself. He is entitled to examine each person presented to him as a juror, in relation to his qualifications, as well as to the state of his convictions in reference to his own guilt or innocence. Sound policy, therefore, dictates that he shall not be permitted, after having had a chance of acquittal, to insist as a ground for a new trial upon a want of qualification in the jurors, of which he might have availed himself as a cause of challenge, by using proper diligence. And such is the rule generally held in this country. 2 Bay, 153; 2 Nott & McCord, 261; 4 Dallas, 353.

This precise question has never been determined by this court, but the principle laid down, and the reasons assigned for it, in Williams v. The State, 37 Miss. R., 407, fully cover the question under consideration. The fact that the accused in this case was a slave, and not a free white person, constitutes no sufficient reason for departing from a rule founded in good sense and manifest policy.

2. Excluding the testimony of the witness Josephine, it is very certain that the facts proved by all the other witnesses do not, beyond a reasonable doubt, establish the guilt of the plaintiff in error; but it is equally certain that, giving full credit to her testimony, the proofs were altogether sufficient to warrant the verdict of the jury. There was a conflict between the testimony of the witness Eliza, a witness examined for the defense, and that of Josephine; and it is manifest that if the jury had given full credit to the former, the result of their deliberations might have been very different. But in such a case, that is, where there is a conflict in the evidence, it is the peculiar province of the jury to decide upon the credibility of the respective witnesses, and to believe the statements of those whom they judge entitled to credit. We are not prepared to say, under all of the circumstances proved by the testimony, that, according to the rules of law, the jury were not authorized to disbelieve the

statements of the witness Eliza, and to credit the testimony of Josephine.

There is also a direct conflict in the testimony of the negro girl Maria, who was examined for the defense, and that of this witness. Maria was the daughter of the wife of the accused, and was, when examined, but eleven years old. Her testimony tends strongly to show that Josephine was the sole agent in the perpetration of the murder. But her testimony is indirectly impeached by that of Professor Moore, who proved that, although there was arsenic in the tea, there was no evidence of the presence of that poison about the handkerchief through which the witness said Josephine had strained something into the teapot. Upon a survey of all the circumstances proved at the trial, we think the jury were fully justified in disbelieving the testimony of the witness Maria.

It is possible that the witness Josephine, in delivering her testimony, may have been influenced by the hope or expectation that, by procuring the conviction of the plaintiff in error, she might escape the consequences of her own crime. But of this fact, as well as of all the circumstances in proof before them, the jury enjoyed a much better opportunity of forming a correct judgment than we possess, who can only look at the transaction through the medium of a record. They were clearly and fully instructed as to the law and their duties in reference to the testimony of the witness Josephine; and having, after a careful and dispassionate examination of the whole evidence, as we must suppose, given credit to her testimony, and rendered their verdict accordingly, we are not authorized to set it aside.

Judgment affirmed.