BYRD *v.* STATE.

(Division B.  Sept. 30, 1929.)

[123 So. 867.  No. 28231.]

*J. B. Sykes* and *J. P. & A. K. Edwards,* all of Mendenhall, for appellant.

*Wm. A. Shipman,* Assistant Attorney-General, for the state.

GRIFFITH, J., delivered the opinion of the court.

In the circuit court of Simpson county, appellant was convicted of the murder of Bilbo Cox, and, the jury having agreed on the punishment, he was sentenced to the penitentiary for life.

There was but one witness in chief for the state. This witness was Burkett Neely, a half-brother of the de-

ceased, Bilbo Cox. The testimony of this witness is: That he and the deceased went, a little after six o'clock on Christmas Eve of 1928, from their home in Braxton to the town of D'Lo, and that they were around the said town with "a bunch of fellows" until some time after midnight, when they started home. That about one-half mile north of D'Lo on the Dixie Highway at a point known as the negro quarters, through which quarters this highway runs, there were three negroes in the highway and that one of them was the defendant. That one of these negroes tried to flag them down, whereupon the witness and Cox turned their car back, and while turning "sombody shot two times." That they then went back to D'Lo and reported the occurrence to two men, one of them the nightwatchman. That in about twenty minutes they resumed their journey towards home, and, when they again arrived at the said negro quarters, and in front of a negro cafe there, two negroes, one of whom was the defendant, flagged them, and one of the negroes said, "Stop." That they stopped, and that Bilbo Cox started to get out of the car, and, just as he did so, without another word having been spoken or any demonstration of any kind having been made, the defendant shot the deceased, Cox, at close range with a shotgun, from the effects of which Cox died on the second day thereafter. The witness expressly disclaimed any knowledge whatever of any reason or motive that could have prompted the act or any of the asserted acts of the defendant.

The testimony of the defendant opened with the introduction of more than a dozen witnesses, taken apparently from the more prominent and responsible walks of life, who testified that they knew the general reputation of the deceased, Cox, in the community in which he lived for peace and violence, and that his said general reputation was bad. The defendant also showed that the

general reputation of the prosecuting witness for truth and veracity was bad, to which we shall refer again later. The state made no effort to refute or dispute this evidence. The defendant then made repeated efforts to show, and did show by the testimony of witnesses taken out of the hearing of the jury but which upon objection was not allowed to get fully to the jury, that both the said prosecuting witness and the deceased were intoxicated, and specifically that they were in that condition on the streets of D'Lo only two hours before the fatal difficulty, and that, as a consequence, they were disorderly on the streets; and by several eyewitnesses who were in no way related to or connected with the defendant, and who are in no manner impeached or discredited, that these two half-brothers in a condition which disclosed every evidence of the excitement of intoxication went into a negro cafe in said negro quarters some time after midnight, and flourishing pistols, they demanded whisky, and, not being able to obtain whisky, then announced that they were not so much looking for whisky as they were for somebody who shot into their car, and that when they found the person they were going to kill him, in which connection we may say just here that there is no evidence that their car was shot into by anybody. That, while thus engaged in this cafe, Wes Byrd, a brother of defendant, came into the cafe for the purpose of inquiring if Jim Smith had been there, and, being informed in the negative, Wes Byrd started to leave, whereupon the prosecuting witness, Burkett Neely, asked him where he was going, to which Wes replied that he wanted to go "up the street." That then the said Neely, with profane expressions, demanded that Wes wait until his hurry was over, and charged Wes with having a pistol, and demanded that Wes put up his hands and be searched, the said Neely announcing between oaths that he Neely was "the law." At this time

the deceased, Cox, joined actively in the enterprise, menacing Wes Byrd with his pistol and with oaths and threats to kill him unless he immediately comply with the demand to put up his hands and be searched. The demand was complied with, and Wes was searched.

At this juncture, the negro John Williams, who was running the cafe and who was much frightened at what was happening, went out hastily through the back way to the neighboring house of Mr. Manning, an elderly white man who owned the property in which the cafe was being operated, and besought Mr. Manning to come to the cafe and see if he could not prevail on these young white men to leave or else desist from their threatening and dangerous conduct. Mr. Manning, however, was unwell from influenza and was unable to go. The defendant, a brother of Wes, was in a house next to Mr. Manning, and, hearing this conversation, and learning that his brother Wes was in trouble, came out and got the particulars thereof from the negro John Williams. The defendant then got a single-barrel shotgun and went to the front of the cafe and called his brother Wes. The latter then again attempted to go out, but the two white youths again barred the way, but, having become interested in the person who had called Wes from the front, the two white men then went to the gallery on the front of the cafe, and, seeing the defendant there with a gun, demanded to know what he was doing with it and demanded that he lay the gun down, and, with a stream of profanity pouring from both of them, they threatened to kill him unless he did so. The defendant during this time was insisting that he did not want any trouble, and that he had only come to get his brother. This was not in accordance with the commands of the two white brothers, and thereupon one of them called to the other to shoot the defendant, at which time one or both of the white men with pistols in their hands had got to the ground

off the gallery and began firing. The defendant fell up against the wall, but not being wholly disabled from the wound, he raised his gun and fired the shot which resulted in the death of Cox. The two negroes then escaped over the gallery through the cafe; the white men still firing so that several bullets lodged in the front of the cafe.

The above statement of facts is necessarily made as brief as is consistent with an understanding of the main bearings of the case. The record is large, and the opinion to cover the more important questions will be of an unusual length even with the facts abbreviated to the extent that they are. For the same reason we are unable to deal with all the assignments of error.

It is assigned as error that the court permitted the state over the objection of the defendant to introduce witnesses to show that, when the two young white men returned to D'Lo after having been first flagged down in the negro quarters, they made certain statements to these witnesses about this alleged occurrence and what those statements were. This was of course for the purpose of corroborating or bolstering up the said prosecuting witness.

"A witness cannot be corroborated by proving that on other occasions he had made statements conforming to his testimony, for such statements are but hearsay." *Owens* v. *State*, 82 Miss. at page 25, 33 So. 718, 720, 21 L. R. A. (N. S.) 782. "It is a principle of the common law that previous declarations of a witness in conformity with his testimony before the court cannot be given in evidence at all affirmatively." *Williams* v. *State*, 79 Miss. at page 558, 31 So. 197, 198. See, also, *Johnson* v. *State*, 80 Miss. 798, 32 So. 49; 16 C. J. p. 643; 40 Cyc. p. 2787.

It is assigned as error that the court sustained objections to repeated efforts on the part of the defendant to

introduce before the jury evidence that both the prosecuting witness and the deceased were intoxicated at the time of the shooting. The assignment is well taken as to both these parties.

"The fact that a witness was intoxicated at the time of the events concerning which he testifies bears upon his capacity for accurate observation and correct memory and hence is proper to be shown in passing on his credibility." 40 Cyc. p. 2574; 28 R. C. L. pp. 618, 619; 2 Wig. Ev., section 933; 1 Wharton Crim. Ev., p. 785.

It will be observed from the statement of facts that the testimony in behalf of defendant showed that the two white youths were the aggressors from start to finish; that they shot first; that they shot the defendant before he fired; and that they were still shooting at him when he fired his only shot; and that they continued to shoot at him as he escaped.

"In determining whether the defendant acted in self-defense, it is competent to show all the circumstances under which the fatal difficulty occurred, and which would in any manner have affected the defendant's motives and apprehensions, or indicate the mental state of the deceased." 6 Ency. Ev., p. 755. "The defendant may show the deceased's intoxication as bearing upon his motive or intention and the defendant's belief in the imminence of his danger." Id., p. 756. The fact of deceased's intoxication has an added element of relevancy when the testimony has shown, as was amply shown and that without dispute in this case, that the general reputation of the deceased for violence was bad, for it is a matter of common observation that intoxication excites or emphasizes the ordinary characteristics of the person and makes a quarrelsome or dangerous man more so, and much the more likely when thus afflicted to indulge, without restraint, his unfortunate propensity to engage in criminal altercations, which when sober he is able to hold

measurably within his control. 2 Wharton Crim. Ev., pp. 1756, 1757, 1760.

The rules of criminal evidence are based almost entirely on ordinary common sense and upon the precepts of the general experience and observations of mankind. To assert that two young white men, both of uniform good character and peaceable disposition, would go after midnight on Christmas Eve to a negro cafe in the negro quarters and there threaten with revolvers and curse and search and frighten and declare themselves to be "the law," and finally shoot the first man who did not instantly obey their commands, would be to assert something which the average mind would not readily accept, for it does not comport with the probabilities of ordinary observation and experience. But how different would the assertion appear when they are shown to be of violent or brawling character and at the time under the influence of intoxicating liquor. It is the object of evidence to disclose the truth, and the truth is, in the normal mind, sought for along the line of reasonable probabilities. And thus it is seldom that those facts, which disclose the logical pertinent probabilities can be immaterial or irrelevant as evidence.

At the conclusion of the testimony both for the state and for the defendant a peremptory' instruction was asked by the defendant and was refused, and one of the assignments of error is that the verdict is contrary to the law and the evidence.

It is the general rule in this state that, where there is any substantial conflict in the evidence so that there is any question of fact material to the issue which requires a solution or determination of the truth out of the conflicting evidence, the solution or determination of the said fact or facts is a function that belongs exclusively to the jury; and is not to be controlled by the court; in short, that decision of fact is the province solely of the jury. But "while it is the thoroughly well-established

general rule that the judge—and this includes the Supreme Court—is not to interfere with the findings of the jury on questions of fact, there is the equally well-established and imperatively essential exception to that rule that, although the court is reluctant to do so, the verdict is reviewable when manifestly it is without the substantial support of any competent evidence, or is clearly contrary to the overwhelming weight of the evidence,'' *Brown* v. *State* (Miss.), 121 So. 297, to which is to be applied, as a corollary of the above statement of the rule, that the support of the verdict must be of believable proof, *Lefere* v. *Krohn*, 127 Miss. 305, 90 So. 12, taking all the evidence of the case into consideration, or, as otherwise stated, the evidence must be such that upon some justifiable view of it the verdict is supported by it —the verdict must be supported by evidence which has such sufficiency in substance and cogency that an impartial and intelligent mind, could reasonably act upon it in support of the conclusion reached, 2 Thomp. on Trials, p. 1507. The use in the foregoing sentence of the two words "impartial" and "reasonably" has been upon deliberate purpose, for they exclude arbitrariness and passion and prejudice. Unless the general rule were qualified as thus stated, the authority of the jury over the facts would be absolute, and the court without power except as to pure and distinct questions of law, which is not the rule in this jurisdiction, and never has been.

In a recent opinion by this court, *Ransom* v. *State,* 149 Miss. at page 266, 115 So. 208, 209, there is found a summary on this point that most aptly may be applied to the case here before the bar. The court said: "The question of the credibility of witnesses is for the jury alone. The state's witnesses, if their testimony be true, make out a case of unjustifiable killing. It is true there were more witnesses for the defendants than for the state, but it is a well-known fact that the testimony of a person

of good character and reputation will naturally outweigh that of persons who are not up to the standard as to credibility. In the case before us, there is no improbability on the face of the state's proof, and it was for the jury to say whether it was, in fact, true.'' It will be noted that the court there referred particularly to the standards of credibility and to the probability or improbability of the state's proof.

In the case now before us, the state's case is made out by the sole testimony of the witness, Burkett Neely, a half-brother of the deceased, with practically everything that tended to corroborate him, admitted into the record erroneously, and with several instances of materially contradictory statements on his part amply shown in the record. As we have already shown, the credibility of this witness was affirmatively impeached by reliable witnesses, who testified positively that his general reputation for truth and veracity was bad, and no effort was made by the state to contradict or dispute this vital proof. The unreliability of this witness being undisputed, it therefore stands before us as established. The unsupported story of this discredited witness that he and the deceased were driving along one of the great state highways, one of the main lines of travel in this state, and, at a point where it was thickly settled with houses, cafes, and stores on each side, were there flagged down by two negroes, one of whom without warning or any words of altercation immediately shot the deceased at close range without any reason or excuse, is a story that carries on its very face the marks of improbability, and this is emphasized when it is seen from the record that numerous witnesses who are shown by the record to be responsible and prominent men of the community, who had long known the defendant, are unanimous in their testimony that the character of the defendant was and had always been good.

If the story of said prosecuting witness be true, then there are but four explanations of the conduct of the defendant: First, that there was some enmity between him and the deceased, but this supposition is removed from the case by the testimony that there had never been any trouble between the parties; second, that the defendant intended to rob the deceased or take his car; and, third, that the defendant had intended to waylay and assassinate some person, and had mistakenly thought the deceased to be that person. But there is in the first place no testimony to give independent color to those two theories, and the improbability of either of them appears at once upon the consideration that either of those purposes would not have been pursued at this thickly inhabited and populous point. It would have been done at some unprotected and lonely place at a further distance on the road. This leaves only the fourth theory, that this defendant, a man shown as aforesaid to have been always of good character, had suddenly turned assassin, and with reckless disregard of the place or of who should see him, for the wanton satisfaction of murdering some human being and of doing it as publicly as may be, had simply flagged the deceased and killed him. If such was the case, then no two jurors qualified to sit on the panel in this state could fail to agree that he deserved the punishment of death. Yet the jury rejected this theory and by unanimous verdict said the defendant should not suffer death.

It is true that, if the testimony of this prosecuting witness had not been disputed by any other evidence and had stood alone as the only evidence in the case, it would have been the duty of the jury and of the court to have accepted it and acted on it, although highly improbable as it appears on its face, although, standing alone, it puts a strain on credulity, and although proved only by an impeached witness, for the reason that although im-

probable it was not impossible, and because of the logical conclusion that if not true it would be disputed by other evidence. But the other evidence was produced, and in our opinion it was ample and cleared up what otherwise would have remained an undenied improbability, and which, although an improbability, if undenied, would have required acceptance even though on the very face of it there was a situation which cried out for an explanation that would reconcile it with something that was rational and probable.

The facts from the standpoint of the defendant were corroborated by several eyewitnesses whose testimony, although differing in detail, was consistent throughout every vital particular, and in every respect was reasonable in view of all the developed circumstances, and every part of which, when taken in conjunction with every other controlling salient fact, presented the probable and only dependable theory that the record affords. We refrain, as we have not the available space, from proceeding by demonstration upon the facts shown in this record, step by step and fact upon fact, to show that the conclusion last mentioned is the only one that can be impartially justified in this case. Upon a careful study of this record and of every detail of it, we cannot escape the conclusion that, if this had been a case where a white man had killed a white man, or a negro had killed a negro, or a white man had killed a negro, there would never have been a conviction. We therefore reverse the verdict and judgment; and, since it is clear, from the entire situation, that the case is such that we would be compelled to take the same action in the event of another conviction, we order the defendant discharged.

*Reversed, and defendant discharged.*