PRUITT *v.* STATE.

(En Banc. March 7, 1932.)

[139 So. 861. No. 29750.]

48

S. C. Broom, of Jackson, for appellant.

Powell, Harper & Jiggitts, of Jackson, for appellant.

52

S. D. Redmond, of Jackson, for appellant.

54

**W. A. Shipman,** Assistant Attorney-General, for the state.

58

Argued orally by **Louis M. Jiggitts** and **S. D. Redmond**, for appellant, and by **W. D. Conn**, Assistant Attorney-General, for the state.

**McGowen, J.**, delivered the opinion of the court.

On an indictment for murder, the appellant, Ervin Pruitt, was tried before a jury of Lauderdale county, found guilty, and sentenced to be hanged.

The indictment is in words and figures as follows:
"Indictment.

"The State of Mississippi, Lauderdale County.

"In the circuit court of Lauderdale County, at the August term in the year of Our Lord Nineteen Hundred and Thirty-one. The grand jury for the state of Mississippi, taken from the body of good and lawful men of Lauderdale county, in the state of Mississippi, impaneled, sworn and charged to inquire in and for said county, in the state aforesaid, in the name and by the authority of the state of Mississippi, upon their oath present: that Ervin Pruitt in said county on the ———— day of August, A. D. 1931, did unlawfully, wilfully and feloniously with malice aforethought kill and murder one James Walton Williamson, a human being, contrary to the form of the statute in such case made and provided and against the peace and dignity of the state of Mississippi.

"District Attorney.

"No. 3605

"Indictment filed this the August 13, 1931

"M. L. Rush, Clerk.

"Recorded August 13, 1931.

"M. L. Rush, Clerk."

The record shows that the appellant was taken into custody on a writ styled "3605."

The judgment of the court below has the following recitals:

"State of Mississippi v. Ervin Pruitt.

"3605

"This day came the district attorney, who prosecutes for the state of Mississippi, and comes the defendant in his own proper person and by counsel, and being arraigned at the bar on a charge of murder, the same being an indictment preferred by the grand jury of this term of court, the said defendant then and there in open court and in the presence of his counsel entered a plea of not guilty to said charge. . . ."

No objection whatsoever was urged to the indictment in the court below.

Frank Williamson and his wife, Luella Williamson, are white people living about three-fourths of a mile from Lauderdale county in Kemper county. They had been married fourteen years. She had four children, three of whom were white, and one, mulatto, the deceased, who was alleged to have been poisoned.

On Thursday, February —, 1931, the baby, aged about three or four months, died from poison administered to it by the mother. The lethal dose was given to the child on that afternoon, and the physician, being called as quickly as possible, found it in a dying condition and directed that it be sent to a hospital in Meridian. Frank and Luella Williamson and two other witnesses carried the child from the Williamson home. One of the witnesses testified that the child died about twelve miles from the Kemper county line at or near Suqualena. Several witnesses testified that the baby was a mulatto. Dr. Pruitt testified that the baby was a mulatto, a negro baby.

On the evening of the murder, Warren and his wife, the parents of Luella Williamson, heard that there was some trouble about the race of Luella's baby, and went to the home of Frank Williamson to see it for the purpose of being convinced. Warren testified that the baby was a negro; that he did not examine it in the house, but that it was brought out to him by its mother, and that there did not appear to be anything wrong with it except a bad cold, and it did not appear to be in any pain. After looking at the baby out at the barn, where Warren and his wife and Frank Williamson were, Warren turned to leave and walked down to his car saying as he left, "My God, Luella!" While her husband, father, and mother were talking at the car, they heard Luella Williamson screaming in the house; returned to the house, and found the baby suffering intensely with its mouth, throat, tongue, and lips badly burned. Theretofore, Warren had a talk with the husband, Frank Williamson, and on telling Williamson that it was said they had a negro baby there, Williamson said it was a lie. Warren said the baby's mouth was black on the inside and it was not in that condition a few minutes before, and that the baby was not suffering until he returned after hearing the woman scream.

Dr. Pruitt testified, stating that he told Williamson, when he visited his home in company with a committee and on that occasion saw the baby, that the community objected to his raising the baby with the other children in the home, and that Mrs. Williamson did not hear this conversation. That Williamson informed Dr. Pruitt that he did not feel disposed to conform to the demand of the committee. The doctor told him that, if it was his baby, it was his duty to stick to it. The physician also testified that he was called back the next day professionally and found the child's mouth had been burned with some kind of caustic poison.

Several physicians testified that, if strychnine had been

used, the child would not have lived more than forty-five minutes, and that it could not have been strychnine, but was some kind of caustic poison.

Luella Williamson testified as to the baby in question that the appellant, Ervin Pruitt, was its father, and pointed him out in the courtroom. She testified that she was at home at night in bed with the baby, and that Ervin Pruitt came into the room and "throwed his gun on me and said that he was going to kill me, and so he had some stuff there and he told me if I did not give the stuff to the baby that he was going to kill me and all the family and he told me that if I did not, he—he said that he was just going to kill all of us right then." He further told her that people were talking about it. She said she gave the stuff which the appellant gave her to the baby on the afternoon of the visit of her father and mother. She said the substance given her was a white powder wrapped up in a blue piece of paper, and that Ervin Pruitt told her it was strychnine.

On cross-examination she declined to say what night it was that Ervin Pruitt had this conversation with her, but, being asked the question several times, she said she thought it was the night before, but reiterated that she did not know, and could not say as to the exact night he was there.

There was evidence by witnesses who said that on one occasion one of the witnesses was near the home of Frank Williamson and saw the appellant go into the house where Luella Williamson was, and that he remained there for a long time. Another occasion was testified to when a witness went to the home of Frank Williamson for the purpose of buying "homebrew" and found the negro, Ervin Pruitt, on the front porch with Luella Williamson and her children, and that when the witness expressed some doubt as to leaving her there with the negro in the absence of her husband, she said that it was all right. That the negro then called her to show him the chickens he was go-

ing to buy. Appellant elicited these statements from the witness.

There was evidence on the part of the jailer to show that the appellant, Ervin Pruitt, and Frank Williamson, the husband of Luella, were placed in jail at Meridian on Sunday, February 22, and were released on bond the following day, February 23, and that appellant surrendered on the following day, February 24.

The baby died en route to Meridian on Thursday evening, after dark, and Frank and Luella Williamson were placed in jail that night.

Frank Williamson, the husband of Luella, testified that Ervin Pruitt lived about two miles from him, and worked for him about a month before the trouble came up, and that when they were released from jail on Monday, February 23 he and the negro, Ervin Pruitt, came from the jail in Meridian to Williamson's home in Kemper county together; that the negro stopped there and talked for a while, and then went on. It is not shown that Williamson knew that Ervin Pruitt had surrendered and had been again placed in jail. The original charge against Frank Williamson and Ervin Pruitt was petit larceny in the stealing of some cotton seed. Williamson further testified that he stayed at home all night on February 24th, with his wife, and that the appellant came to his (Williamson) home the night before he gave up and told him he (Ervin Pruitt) was threatened with a mob, and there were rumblings about Luella Williamson having a baby by him (Ervin Pruitt). Williamson said that Pruitt knew people were talking that way, and that Pruitt told him the white folks were going to mob him for "having this baby by a white lady." It was Frank Williamson's recollection that this conversation occurred one night and the baby died the next night, and he also testified that Dr. Pruitt talked with him in reference to the child, and told him there would have to be something done about it, that it had to be "put over," and that the child could

not be kept there. Williamson also said that his father-in-law talked to him about the baby; and that he never saw anything improper between his wife and the negro, Ervin Pruitt, and that he did not watch them.

In the course of the argument of the case, the district attorney used the following words: "While the witness, Mrs. Luella Williamson, was testifying, did you see him making eyes at her? The attorneys for the appellant objected to this statement, whereupon the court admonished the district attorney to stay within the record and confine his argument to the evidence, and to this remark the appellant tendered a special bill of exceptions which was made a part of the record, by the trial judge.

There were numerous instructions granted the appellant which were most liberal to him. Only two instructions were granted to the state, the granting of one of which is assigned as error, and the instruction complained of reads as follows: "The court instructs the jury for the state, that if you believe from the evidence in this case beyond a reasonable doubt that Luella Williamson deliberately gave to James Walton Williamson some foreign substance unlawfully, and for the purpose of producing the death of the said James Walton Williamson, and with the deliberate intention of producing death, and that such substance was furnished her by the defendant with instructions to give same to the said James Walton Williamson for the purpose of deliberately producing his death, and that same was given pursuant to such instructions, if any, and that same, if any such there was, did produce the death of James Walton Williamson, then, under the law, the defendant is guilty of murder."

1. It is contended that there is no identified indictment in this record upon which the judgment of the court can rest.

No objection was presented to the lower court as to the validity or identity of the indictment.

It is also contended that under section 1198, Code of 1930, an indictment must show on its face the name of the foreman of the grand jury indorsed thereon, and that the indorsement of the foreman, together with its being marked filed by the clerk and signed and dated by him, shall be the legal evidence of the finding thereof. The indictment in the case at bar was not indorsed by the foreman of the grand jury, but the record shows that the appellant was arraigned thereon, and pleaded thereto, and interposed no motion to quash the indictment or demurrer thereto.

In virtue of section 1193, Code of 1930, which, among other things, provides that no verdict or judgment shall be ''arrested, reversed or annulled after the same is rendered, for any defect or omission in any jury, either grand or petit, or for any other defect of form which might have been taken advantage of before verdict, and which shall not have been so taken advantage of,'' in conjunction with section 1206, Code of 1930, to the effect that all objections to an indictment must be taken by a demurrer thereto and not otherwise, and not afterwards, this question has been set at rest by this court. In the case of Wooten v. State, 155 Miss. 726, 125 So. 103, 105, this court said: ''We hold, under these statutes, that this question cannot be raised, for the first time, on appeal.''

In the Wooten Case, the objection to the indictment was that the clerk had failed to mark it filed. In the case at bar, the objection is that the foreman of the grand jury did not indorse his name on the indictment. There can be no substantial difference between the two cases. They cannot be distinguished. The Wooten Case was decided by a divided court, and the writer of this opinion did not agree with the controlling opinion, but that opinion must now control the judges of this court. There is, therefore, no reversible error predicated upon this objection and the other objections urged to the indictment.

2. It is urged that the case should be reversed, be-

cause, over the objection of the appellant, the state was permitted to prove by witnesses that, in their opinion, the deceased infant was a mulatto or negro, it being contended that expert witnesses only could testify as to the race of an individual; that it requires an ethnological anthropological expert to distinguish a mulatto from a white child.

It is quite well settled that persons familiar with the negro race, as to the mixture of negro 'with white blood, may tesify concerning the same. 1 Wharton's Criminal Evidence, page 843; Underhill's Criminal Evidence, sec. 53; and State v. Jacobs, 51 N. C. 284.

In this state, where the white and the negro race are about equally divided in population, we have no hesitancy in saying that the opinion of a nonexpert as to race is competent evidence for the jury to consider.

3. It is next contended that the evidence of Luella Williamson, an accomplice, is the only evidence that tends to incriminate the appellant, and that her testimony is so unreasonable and improbable as to make the judgment of the court below a palpable miscarriage of justice.

Luella Williamson testified positively and unequivocally that the appellant gave to her the white powder which she gave to the child, telling her it was strychnine to be given to the child to produce its death, and it is clear that whatever substance she administered to the child brought about its death within two or three hours thereafter. If this statement is true, the appellant is guilty as charged.

After a most careful examination of this record, we are bound to say there is not a line or syllable of testimony contradicting this statement to be found therein.

The rule is that we must consider evidence offered on behalf of the state most favorably in determining whether or not we will reverse the case, because the conviction stands mainly upon the evidence of Luella Williamson, confessedly an accomplice, and the main agent in pro-

ducing the death of a human being. It has long been settled in this state, beyond peradventure, that the testimony of an accomplice alone, uncorroborated, is sufficient to sustain a verdict of guilty. Keithler v. State, 10 Smedes & M. 192; Dick v. State, 30 Miss. 593; Strawhern and Grizzle v. State, 37 Miss. 422; George v. State, 39 Miss. 570; Fitzcox v. State, 52 Miss. 923; White v. State, 52 Miss. 216; Wilson v. State, 71 Miss. 880, 16 So. 304; Matthews v. State, 148 Miss. 696, 114 So. 816; Gates v. State, 160 Miss. 479, 135 So. 189.

A strong appeal is made to this court to take into consideration that the appellant here is a negro; that the evidence shows uncontradictedly that he was the father of a baby conceived and brought forth by a white woman, and that the jury convicted him of miscegenation rather than of murder.

It is unquestionably settled in this case that Luella Williamson administered poison to the baby which produced its death, and it was of such a tender age that it could do no harm to any person. Luella says she gave the poison on the demand of the appellant; that he furnished her with the means and instrumentalities with which to bring about the baby's death. She states he was at her house and made the statement to her which is quoted in this record; but the appellant says, in reply, that on the day the poison was administered to the baby he was confined in jail at Meridian. She does not say the conversation occurred on a particular night. She is corroborated by the fact that they had been intimate; that they both knew that the neighborhood was aroused about the mongrel baby; that there were rumblings and a committee had called upon her husband, and threats of a mob had reached the appellant. On some night, just prior to the murder of this infant, this appellant was at the home of Frank Williamson, according to his statement, and the appellant showed great anxiety on that occasion about the state of mind of the

people of that community. The appellant may have, on the same night, or just prior thereto, visited the woman without the knowledge of the husband. He must have had a powerful influence upon the woman, as reflected by every line in this record. In other words, so far as she was concerned, Ervin Pruitt's was the master mind. She had consented to become abased, and subjected to his lecherous embraces, and had gone the limit of degradation with him. How then, can we say that her story is unreasonable? The record shows that she had been convicted of the crime and sentenced to serve a life term in the state penitentiary. What reward could she expect, what further punishment could be inflicted upon her? What motive for swearing falsely can be urged in this case, unless we leave the path of logic and have recourse to a vivid imagination? She would remain silent when asked some questions, only on two or three occasions, but can it be imagined that there could be a more harrowing, heartbreaking scene for a woman than the one enacted in the trial of this suit? She confessed murdering her own offspring, her infidelity to her husband, and her infidelity to her race. She admitted her double shame, her share in crime without attempt at concealment.

Under these circumstances, should we set aside the verdict of a jury of twelve men who witnessed her demeanor while testifying before them, who were from another county than the one in which the appellant and the other witnesses resided, and who are presumed to have been of good character and to be intelligent men? Can we invade their province? Can we say that, because she was confessedly a bad woman, and confessedly a murderess, while we will submit the question to the jury, yet we will not permit their verdict to stand thereon? There are too many cases of conviction in this country rendered upon the uncorroborated testimony of an accom-

plice whose hands are as deeply dyed in blood as his principal, now to say that we will not accept testimony when it is undenied and when it is not unreasonable.

We cannot say, as a matter of law, that the trial judge erred when he overruled the motion for a new trial. He, too,- saw and heard all the testimony in this case, which was peculiarly a question for the jury.

The appellant cites Byrd v. State, 154 Miss. 742, 123 So. 867, and it is said by counsel that it is an identical case where an innocent negro was convicted for killing a white man. There the evidence was challenged and denied. In the case at bar it stands unchallenged and undenied. There is no similarity between the cases when analyzed.

We decline to disturb the verdict and judgment.

4. The appellant contends that the court erred in permitting the state to show the illicit relations existing between Luella Williamson and Ervin Pruitt, and that thereby the crime of adultery was shown.

Evidence of this character was competent to show motive for the crime on the part of the appellant. See Raines v. State, 81 Miss. 489, 33 So. 19, and Collier v. State, 106 Miss. 613, 64 So. 373.

5. The fifth assignment of error argued by the appellant is as to the alleged inflammatory remarks of the district attorney in his argument before the jury, calling attention to the fact that the engro defendant was making eyes at the white woman while she was on the witness stand. The defendant had not been a witness in his own behalf in this case, and it is alleged that this aroused the jury and raised the race issue in an unwarranted degree.

It will be observed that the court, upon this occasion, admonished the district attorney to stay within the record and confine his argument to the evidence. If it be conceded that this was a statement of fact, and that the remarks were prejudicial, the court, in our opinion,

granted to the appellant all that he requested. To thus admonish the district attorney was equivalent to sustaining his objection, and the court cannot be put in error on a matter not presented to it.

The court could do no more without a request from the appellant. See Redwine v. State, 149 Miss. 741, 115 So. 889, and the case of Bob Wells v. State, 139 So. 859, this day decided by this division.

6. Error is predicated upon the granting of the second instruction for the state, and it is insisted that the instruction omits from it the words "with malice aforethought" or their equivalent, citing Burnett v. State, 92 Miss. 826, 46 So. 248. And it is further urged that the instruction fails to state that the poison was administered without authority of law, or equivalent words.

It will be observed that the instruction told the jury that the substance was administered unlawfully for the purpose of producing the death of James Walton Williamson, with the deliberate intention of producing his death, which we think was sufficient.

The poison could not be administered to a baby three months old with the deliberate intention of producing its death without it being unlawful. There could be, in this case, no degrees of the crime. If the poison was so administered, it was murder. We are of the opinion there is no merit in the objection to this instruction.

There are many other exceptions pointed out in the record which are entirely without merit.

We are of opinion that the appellant has had a fair and impartial trial, and that his fate hinged upon the verdict of the jury, which has been adverse to him, and, under applicable rules of law, we are not warranted in interfering with this verdict and judgment.

Friday, the 15th day of April, 1932, will be fixed as the date of his execution.

Affirmed.

**Anderson** and **Griffith, JJ.** (dissenting).

Mrs. Williamson was confessedly an accomplice. If the appellant's conviction is to stand, it must be solely on her evidence. There is no corroboration. That which the state claims as corroborative of her story is too shadowy and intangible to amount to corroboration. And, Mrs. Williamson's narrative, we think, is so unreasonable and improbable as to be unbelievable.

We see no good purpose that would be answered by setting out more fully the reasons on which we base this dissent.

Without hesitation, and with the utmost confidence in our position, we are of the opinion that appellant is entitled to a reversal of the judgment of conviction and a discharge.