# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-KA-01652-COA

JESSIE FREEMAN                                                                  APPELLANT

v.

STATE OF MISSISSIPPI                                                            APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 10/14/2014 |
| TRIAL JUDGE: | HON. JEFF WEILL SR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | WILLIAM SCOTT MULLENNIX |
| | PERCY STANFIELD |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BILLY L. GORE |
| DISTRICT ATTORNEY: | ROBERT SHULER SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF COUNT I, MANSLAUGHTER, AND SENTENCED TO SERVE TWENTY YEARS; AND COUNT II, DEPRAVED-HEART MURDER, AND SENTENCED TO SERVE FORTY YEARS, WITH THE SENTENCES IN COUNT I AND COUNT II TO BE SERVED CONSECUTIVELY IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS |
| DISPOSITION: | AFFIRMED - 04/05/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., BARNES AND WILSON, JJ.**

**LEE, C.J., FOR THE COURT:**

¶1.     Jessie Freeman was convicted by a Hinds County Circuit Court jury of one count of manslaughter and one count of murder.    He was sentenced to twenty years for the

manslaughter conviction and forty years for the murder conviction, with both sentences to be served consecutively in the custody of the Mississippi Department of Corrections. His posttrial motions were denied.

¶2. Freeman now appeals, asserting the trial court erred by refusing to allow his expert witness to testify.

**FACTS**

¶3. On the morning of June 11, 2012, Freeman drove with his seven-year-old daughter, Jayden, from Brandon, Mississippi, to Jackson, Mississippi. Freeman was looking for his wife (and Jayden's mother), Lenora Freeman. Freeman testified that he was able to locate Lenora using the GPS technology on Lenora's cell phone, which Freeman could access on his cell phone. According to Lenora's employer, Lynn Outlaw, Lenora had called him around 8:30 a.m. that morning (June 11) requesting the day off work. Outlaw testified that Lenora told him she had argued with Freeman on June 8, and Freeman had threatened to kill her. Lenora told Outlaw she was leaving Freeman. Freeman also called Outlaw twice the morning of June 11 looking for Lenora. Outlaw told Freeman that Lenora was not working that day.

¶4. Freeman testified that he located Lenora's cell phone at a Studio 6 Motel. As he turned into the parking lot, he saw Lenora's truck in the back section. Freeman saw Alan Ramsey sitting in the driver's seat. Freeman stated that he drove up to the truck and exited his car, leaving Jayden in the passenger seat. According to Freeman, Ramsey looked "wild-eyed" and agitated and suddenly pointed a gun at Freeman. Freeman then stepped back into

2

his car to grab his gun, which was located between the driver's seat and the center console. He then fired three shots at Ramsey. One of these shots hit Lenora, who was also in the truck. Freeman stated he did not see Lenora in the truck – that she was crouched down in the passenger seat.

¶5. Freeman left the scene but was followed by Ramsey, who was driving Lenora's truck. Ramsey rear-ended Freeman but lost control of the truck and crashed into the retaining wall outside of the motel. According to one witness, Freeman exited his car after the crash, inspected the truck, and then fled the scene.

¶6. Freeman testified he drove to St. Dominic's Hospital and parked his car in the garage. He called a friend to pick up him and Jayden. Freeman later consulted with an attorney and turned himself in to the police.

¶7. The medical examiner, Dr. Erin Barnhart, testified that both Ramsey and Lenora died from gunshot wounds, not the car accident. Ramsey had two gunshot wounds, with the fatal shot entering his heart. Lenora had one fatal gunshot wound to her head.

¶8. A gun was found in Lenora's truck, but it was unloaded and in its holster beneath a seat. The testimony at trial was not clear as to which seat the gun was underneath. The bullets to this gun were found in Lenora's purse.

¶9. Rodolfo Falcon witnessed the shooting. At the time of the shooting, Falcon was living in the motel and had spoken with Ramsey that morning about another matter. Falcon saw Freeman's car speed into the parking lot, then saw Freeman exit the car holding a gun and start shooting at the truck. Falcon saw both Ramsey and Lenora sitting in the truck. Falcon

testified that Ramsey did not have a gun.

## DISCUSSION

¶10. In his only issue on appeal, Freeman contends the trial court erred by refusing to allow his expert to testify that methamphetamine use causes violent behavior. Freeman's theory of the case was that he shot Ramsey in self-defense. Freeman argues that Ramsey was under the influence of methamphetamine, which caused Ramsey to act aggressively by exhibiting a gun; thus, Freeman had to defend himself and his daughter. Our standard of review for the trial court's admission or exclusion of evidence is abuse of discretion. *Muscolino v. State*, 803 So. 2d 1240, 1244 (¶16) (Miss. Ct. App. 2002).

¶11. According to Freeman, he had personal knowledge of Ramsey's prior drug use and Ramsey's behavior while under the influence. Freeman testified that he had observed Ramsey shoot crystal meth over one hundred times in the ten years Freeman had known him. Freeman stated that Ramsey's methamphetamine use caused him to appear "wild-eyed and crazy looking" and have a short temper.

¶12. Joe Ellington, a toxicologist at the Mississippi Crime Laboratory, testified that Ramsey's urine screen was positive for, among other things, amphetamine and methamphetamine and Ramsey's blood screen was positive for methamphetamine. Ellington testified that he did not determine the quantity of illegal drugs in Ramsey's system.

¶13. After Ellington's testimony, Freeman called Dr. Steven Hayne to the stand to testify about the effects of methamphetamines on a person's behavior. Outside the presence of the jury, the trial court asked for a proffer of Dr. Hayne's testimony. Dr. Hayne testified that

4

methamphetamine use can produce "psychosis, including paranoia, [and] hallucinations" in a chronic abuser. Dr. Hayne stated the drug can impact other "personality aspects, including reason, aggressiveness, agitation and the like." Dr. Hayne also stated that "the dosage of methamphetamine does not correlate well with the symptomatology. Individuals can have very high levels of methamphetamine and show some impairment. You can even be in the therapeutic ranges of [use] and it can produce death."

¶14.   On cross-examination, Dr. Hayne admitted that it would be helpful to know the quantity of methamphetamine in a person's blood in order to determine the effect on his behavior. Dr. Hayne stated, "It would always be better to have the blood levels. . . . The blood level would certainly point you in a direction. But being on the drug and then looking at any behavior that was observed, you could either support that as being contributed to by methamphetamine or exclude that behavior."

¶15.   Freeman cites to *Byrd v. State*, 154 Miss. 742, 123 So. 867 (1929), and *Newell v. State*, 49 So. 3d 66 (Miss. 2010), for support. The court held in *Byrd* that the defendant can raise the victim's intoxication to demonstrate all the conditions existing at the time of and giving rise to the killing, including the victim's mental state. *Byrd,* 154 Miss. at 749, 123 So. at 869. "The defendant may show the deceased's intoxication as bearing upon his motive or intention and the defendant's belief in the imminence of his danger." *Id*.

¶16.   In *Newell*, the trial court ruled that evidence of the deceased victim's toxicology results was irrelevant. *Newell*, 49 So. 3d at 72 (¶15). Newell had attempted to cross-examine the forensic pathologist regarding the victim's blood toxicology results, but the trial court

5

excluded it. *Id*. at (¶14). The trial court explained that evidence of the victim's toxicology results was irrelevant because, at the time the forensic pathologist testified, no evidence had been brought forth to show any violent action or behavior by the victim. *Id*. at (¶15). However, the supreme court found that at the time the forensic pathologist testified, the relevance of the victim's toxicology results had been established, explaining:

> The jury obviously knew that [the defendant] was on trial for fatally shooting [the victim], and it already had heard that the shooting had occurred soon after [the victim]'s allegedly aggressive and violent behavior, evidence of which had been presented through testimony by [witnesses] present at the stand-off. [So the victim's] toxicology results were relevant to show "all the circumstances under which the fatal difficulty occurred, and which would in any manner . . . indicate the mental state of the deceased.". . . Therefore, the exclusion of [victim]'s toxicology results was an abuse of discretion, because the relevance of that evidence had been established at the time [the forensic pathologist] took the stand.

*Id*. at 73 (¶17) (internal citations omitted). The supreme court ultimately found that the exclusion of the toxicology evidence amounted to reversible error. *Id*. at (¶18).

¶17. Freeman's case differs from both *Byrd* and *Newell* because the jury was able to hear from Ellington that Ramsey tested positive for methamphetamine and from Freeman that Ramsey's methamphetamine use caused him to appear "wild-eyed and crazy looking" and have a short temper. Furthermore, the cited cases do not concern the testimony of an expert linking drug use and behavior.

¶18. Expert testimony must be relevant and reliable. *Galloway v. State*, 122 So. 3d 614, 632 (¶27) (Miss. 2013). "Expert testimony is relevant if it will 'assist the trier of fact in understanding or determining a fact at issue.'" *Id*. (quoting *Ross v. State*, 954 So. 2d 968, 996 (¶57) (Miss. 2007)). "Expert testimony is reliable if it is 'based on methods and

6

procedures of science,' not 'unsupported speculation.'" *Id*. (quoting *Ross,* 954 So. 2d at 996 (¶57)). Under our modified *Daubert*[1] standard, expert testimony should be admitted under Mississippi Rule of Evidence 702 if the witness is qualified and the witness's testimony "assist[s] the trier of fact in determining or understanding a fact at issue." *Anderson v. State*, 62 So. 3d 927, 938 (¶32) (Miss. 2011).

¶19.    The trial court found that under Rule 702, Dr. Hayne's testimony was not "based on sufficient facts or data, primarily because there [has] been no specific evidence presented concerning a quantification of the substance." The trial court further found that under Mississippi Rule of Evidence 403, the evidence would be confusing and misleading to the jury, stating "there's no link to the victim. There's no quantity in the [toxicology] report. There's no indication of how recently the drugs were in the body fluids of the victim."

¶20.    We can find no abuse of discretion by the trial court. Dr. Hayne's proffered testimony was speculative at best since it was based upon insufficient facts and data. There was no testimony concerning the amount of methamphetamine in Ramsey's system, a fact that Dr. Hayne admitted would be helpful in determining the effects of the drug on Ramsey. This issue is without merit.

¶21.    Freeman also contends the trial court erred by not allowing Ramsey's toxicology report to be admitted into evidence. However, during trial, the trial court noted the toxicology report could be admitted with the proper foundation. Freeman responded that the physical report need not be submitted because the testimony of the lab technician (Ellington)

---

[1] *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993), *as modified in Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

7

would be sufficient. After this point, Freeman did not try to get the toxicology report admitted. Regardless, the admittance of this report would have been cumulative since the jury heard from Ellington that Ramsey's blood and urine screens tested positive for methamphetamine. *See Weeks v. State*, 493 So. 2d 1280, 1284-85 (Miss. 1986).

¶22. **THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT OF CONVICTION OF COUNT I, MANSLAUGHTER, AND SENTENCE OF TWENTY YEARS; AND COUNT II, DEPRAVED-HEART MURDER, AND SENTENCE OF FORTY YEARS, WITH THE SENTENCES IN COUNT I AND COUNT II TO BE SERVED CONSECUTIVELY IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.**

**IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, JAMES, WILSON AND GREENLEE, JJ., CONCUR. FAIR, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. CARLTON, J., DISSENTS WITH SEPARATE WRITTEN OPINION.**

**CARLTON, J., DISSENTING:**

¶23. I respectfully dissent and find that the trial court abused its discretion in excluding Dr. Hayne's expert testimony as to the effect of methamphetamine on the behavior of a person who had used the drug. Dr. Hayne, Freeman's expert, made his proffer to the trial court outside of the presence of the jury. Dr. Hayne testified that methamphetamine use can produce "psychosis, including paranoia, [and] hallucinations" in a chronic abuser. He also stated the drug can impact other "personality aspects, including reason, aggressiveness, agitation and the like." Dr. Hayne provided that "the dosage of methamphetamine doesn't correlate well with the symptomatology. Individuals can have very high levels of methamphetamine and show some impairment. You can even be in the therapeutic ranges of [use] and it can produce death." Dr. Hayne stated that methamphetamine users "have high

8

rates of death by violence. They also have high rates of injury."

¶24. On cross-examination, Dr. Hayne admitted that being able to test a person's blood levels would "certainly point you in the right direction" on determining how methamphetamine affected that individual. However, Dr. Hayne stated that even without a blood test, "you could reasonably come to some conclusion" about how the drug affected an individual. Dr. Hayne testified that "being on the drug and then looking at any behavior that was observed, you could either support that as being contributed to by methamphetamine or exclude that behavior."

¶25. The record reflects that Freeman established that Ramsey's toxicology report reflected that he tested positive for amphetamine and methamphetamine. As stated, Dr. Hayne's proffer provided that the dosage did not correlate well with the symptomatology and thereby established that the lack of a known quantity of the drug was not critical to testimony as to effect of the methamphetamine in a person using the drug.

¶26. Freeman testified that he shot Ramsey in self-defense after Ramsey pointed a gun at him, and Freeman described Ramsey as wild-eyed and agitated. Freeman testified that he had observed Ramsey under the influence of methamphetamine in the past and that Ramsey was wild-eyed and short-tempered.

¶27. The record reflects that Freeman established that the victim had used methamphetamine when the incident occurred, and the record also reflects evidence that Ramsey had previously been short-tempered when using methamphetamine. The expert testimony proffered showed that methamphetamine use increases propensity for violence,

9

regardless of the dosage. The record reflects that Freeman established the relevancy link of Ramsey's toxicology results with his theory of self-defense in an effort to show Ramsey as the initial aggressor.[2] *See Byrd v. State*, 154 Miss. 742, 749, 123 So. 867, 869 (1929) (holding that alcohol intoxication of the victim may be relevant in a claim of self-defense when the testimony has shown that the victim had a reputation for violence); M.R.E. 401 (defining relevant evidence). The exclusion of this defense evidence implicates Freeman's Sixth Amendment right to confrontation. Furthermore, this relevant evidence was necessary for Freeman's theory of self-defense. Therefore, I respectfully submit that it was an abuse of discretion for the trial court to exclude this evidence from the jury's consideration of the case.

---

[2] *But see Rouster v. State*, 981 So. 2d 314, 318 (¶12) (Miss. Ct. App. 2007) (no evidence in the record showed or linked violent behavior with smoking marijuana, and the court ruled the evidence that the victims were smoking marijuana was therefore irrelevant).