# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2009-KA-00701-SCT

*JAMES C. NEWELL, JR.*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/26/2009 |
| TRIAL JUDGE: | HON. JAMES T. KITCHENS, JR. |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF INDIGENT APPEALS |
| | BY: LESLIE S. LEE |
| | PHILLIP BROADHEAD |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEFFREY A. KLINGFUSS |
| | LISA L. BLOUNT |
| DISTRICT ATTORNEY: | FORREST ALLGOOD |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 12/02/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., LAMAR AND PIERCE, JJ.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1. James C. Newell appeals his conviction for manslaughter stemming from his altercation with and fatal shooting of Adrian Boyette in the parking lot of the Slab House bar in Lowndes County. We find that the trial court committed reversible error in one of its evidentiary rulings and in refusing one of Newell's requested jury instructions on the newly revised statutory presumption under the "Castle Doctrine." So we reverse and remand.

**FACTS AND PROCEDURAL HISTORY**

¶2.     James C. Newell lived in Vernon, Alabama, but worked in and around Columbus, Lowndes County, Mississippi. Newell married his wife Diane on April 30, 2008, despite a previously tumultuous relationship. During their two-week marriage, Newell suspected Diane of cheating on him with Tony Hayes, with whom she previously had lived. In fact, Newell already had consulted an attorney about getting a divorce from Diane because of her suspected infidelity. On May 14, 2008, at around 5:00 p.m., Newell called Diane's cell phone and left two voicemail messages. In the first message, he threatened to shoot Diane and Tony, but in the second message he recanted. Nonetheless, later that evening, Newell drove from Vernon, Alabama, over the state line to the Slab House bar on Caledonia-Vernon Road in Lowndes County, Mississippi. He stated that he went there to confirm Diane's and Tony's relationship before he went through with the divorce.

¶3.     When Newell arrived at the Slab House sometime between 8 and 9 p.m., he saw Diane's truck in the parking lot, but Diane was not there.[1] Newell saw Adrian Boyette, whom he did not know, standing near Diane's truck. And he saw Boyette's friend, Jason Colby Hollis, standing nearby. Newell asked Boyette if he knew the woman who drove Diane's truck, if he knew where she was, and if he had seen a man with her.[2] Boyette said he did not, so Newell pointed toward Hollis and asked who he was. Boyette responded that Hollis was his friend and told Newell not to go over there and mess with him. Some harsh

---

[1] The owner of the Slab House testified at trial that Diane and Tony were not in the bar or in the parking lot at the time of the shooting.

[2] The officers who testified at trial stated that Newell had told Sullivan that his first question to Boyette was not where Diane was, but whether he was the man who had answered Diane's cell phone earlier.

words were exchanged between Newell and Boyette, and Newell turned around and walked back toward his own truck.

¶4.    Boyette followed Newell back to his truck.  According to Newell, as he was entering the truck, Boyette began shouting and beating on the truck.  Newell testified that Boyette stated that he was going to "[mess] [Newell] up!"  At some point, Boyette shut the truck door on Newell's leg.  Newell said he never pushed, shoved, or struck Boyette in response to his aggression.  According to Newell, after the truck door was completely closed, Boyette continued beating on the truck and yelling "I'm fixing to get you – [mess] up your world. I'm fixing to – get [yourself] out of that truck."  At this point, Newell began backing up the truck.  But Newell testified that he continued to fear for his life[3] because:

> [Boyette] come around there, come around and grabbed on the door, like opening the door, like he was either – from the look in his eyes, he was either going to – you know, he was going to try to open that door, just stand there beat – hitting on me when I was sitting in the door, or he was trying to snatch me out of the truck.

Then, Newell pushed on the door from the inside, and Boyette backed up just enough for Newell to step out of the truck.  Next, according to Newell, "[Boyette] said 'I'm fixing to cut you up,'" and "when he grabbed at his pocket, that's when [Newell] reached under the . . . seat of the truck, pulled the pistol out, and shot him."[4]  Newell then jumped back into his truck and fled to his home in Vernon, Alabama.  Although Boyette never displayed a knife

---

[3] Newell testified that he is five feet, eight inches, tall and that, at the time of the altercation, he weighed approximately 180 pounds.  Boyette was six feet tall and weighed 255 pounds.

[4] Newell testified that he always kept the gun in his truck and carried it with him because he often worked in a dangerous part of town where his boss previously had been robbed and shot.

or any other weapon, a pocket knife later was found in his pocket. Boyette died from the gunshot.

¶5. Larry Swearingen, who worked as the "town cop" with the Caledonia Marshall's Department, was the first on the scene at the Slab House. He issued a "be on the lookout" ("BOLO") advisory for Newell's vehicle, heading toward Vernon, Alabama, on Highway 12. Later, law enforcement officers in Alabama responded to a call that the man identified in the BOLO was at his home in Vernon and was threatening to commit suicide. Officers James Carl Smith and Jeff Patrick of the Vernon Police Department, as well as Deputy Rodney Jones of the Lamar County (Alabama) Sheriff's Department responded to Newell's residence around 9:30 p.m., followed shortly thereafter by David Sullivan, an investigator with the district attorney's office in Alabama, who knew Newell personally.

¶6. When Sullivan arrived at Newell's residence, he encountered a standoff between Newell and the other officers. Newell was kneeling by a tree, holding a gun to his own head, and telling the officers to stay back. When officers asked Newell to drop his gun, Newell stated: "Why? You're going to have to kill me, I'm not going to jail." To try to get him to relinquish the gun and surrender, Sullivan moved closer and had a conversation with Newell, with the other officers listening. Sullivan testified that he asked Newell what had happened,[5] and Newell related his version of the events surrounding the shooting at the Slab House.[6]

_____

[5] It is undisputed that Newell was not given any **Miranda** warnings before his conversation with Sullivan. *See **Miranda v. Arizona***, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[6] Sullivan testified that:

[Newell] had an altercation with somebody he didn't know there. They

4

Newell told Sullivan "They won't believe me. They won't believe my side of the story."[7]

Newell said that he was going to commit suicide because he was determined not to go to jail.

¶7.     In an effort to defuse the situation, Sullivan agreed to some of Newell's "demands." Specifically, Newell wanted Diane's cell phone "seized" to prove her infidelity by showing all of her calls to Tony Hayes and other purported paramours. He also wanted his truck fingerprinted to show Boyette's contact with it. The Alabama officers notified the officers back at the Slab House, who got Diane's cell phone, which still contained the voicemail messages Newell had left earlier that day. But due to moisture present on Newell's truck window, no fingerprints were recovered. After a tense, one-hour standoff, Newell surrendered and was taken into custody by the Lamar County Sheriff's Department.

¶8.     Although Newell was indicted and tried for deliberate-design murder, the jury found Newell guilty of the lesser-included offense of manslaughter. The trial court sentenced Newell to serve twenty years in the custody of the Mississippi Department of Corrections, and to pay all court costs and funeral expenses. Newell filed an unsuccessful motion for judgment notwithstanding the verdict (JNOV), or, in the alternative, for a new trial. Newell timely filed his notice of appeal, in which he raises the following four issues.

_____

followed him out to his truck. [Newell] said, "I got in the truck to leave." This unknown white male started beating on his truck, beating on his door glass, threatened him. He said – well, his exact words, the unknown subject approached his truck and started threatening him. [Newell] stated he was backing up, and the unknown man, subject, started banging on his driver's side door window. [Newell] said, "I opened the door, popped a cap in [him]." He said, "He told me he had something for me. I had something for him."

[7] Newell testified that he thought the authorities would never believe his version of the shooting because of the voicemail messages he had left on Diane's cell phone.

5

I. Whether the trial court erred in allowing the Appellant's personal telephonic voicemail messages, left for and meant to be heard only by his wife, into evidence over a [Mississippi Rule of Evidence] 504 spousal privilege objection since she was neither a victim of any crime nor an adverse party to these proceedings.

II. Whether the trial court erred in refusing to allow defense counsel to cross-examine expert witness Dr. Stephen [sic] Hayne regarding the findings of the toxicology report after performing the decedent's autopsy, especially in light of the theory of self-defense advanced in the case.

III. Whether the trial court erred in ignoring the evidence that supported a theory of self-defense and refusing to grant a separate jury instruction defining the elements of necessary self-defense and the statutory protections of the "Castle Doctrine."

IV. Whether the trial court erred when it denied the Appellant's motion for a directed verdict for legal insufficiency in the prosecution's case or, alternatively, to grant the Appellant's motion for a new trial (JNOV) where the verdict was against the overwhelming weight of the evidence.

We address only Issues I through III. *See* Miss. R. App. P. 17(h).

## DISCUSSION AND ANALYSIS OF LAW

### I. Refusal to exclude voicemail messages

¶9. Newell argues first that it was error to admit into evidence the two voicemail messages he had left on Diane's phone, a recording of which was played for the jury during Sullivan's testimony. In the first message, Newell stated:

> You're probably up at the Slab [House], . . . or over at Tony's, but I bet you're at the Slab, and you want me to come up there so Mike will whip [me]. But I tell you what I'm going to do: I'm fixing to come up there and pop a cap in [you] and hi[m], too.

In the second message, Newell stated, essentially, "never mind, neither one of you are worth it." "The standard of review regarding admission or exclusion of evidence is abuse of

6

discretion. We will not reverse the trial court's evidentiary ruling unless the error adversely affects a substantial right of a party." ***Mingo v. State***, 944 So. 2d 18, 28 (Miss. 2006) (citing ***Parks v. State***, 884 So. 2d 738, 742 (Miss. 2004)). *See also* Miss. R. Evid. 103(a).

¶10. Newell asserts that the voicemail messages are subject to spousal privilege under Mississippi Rule of Evidence 504(b) and that Diane was not competent to aid investigators under the spousal competency standards in Rule 601(a). *See* Miss. R. Evid. 504(b), 601(a). The State contends that the threats in the messages were relevant to show Newell's deliberate design to shoot "somebody" that day, which he ultimately did, and that such threats presented a controversy between the spouses, an exception to spousal incompetency. We find that the messages were relevant and were not excluded by Rules 504 and 601.

¶11. The husband-wife privilege protects confidential communications between spouses. Miss. R. Evid. 504. A "confidential" communication is made in private and is not intended for disclosure. Miss. R. Evid. 504(a). Before a privileged communication may be revealed, both spouses must consent. *See* Miss. R. Evid. 504(c); ***Hickson v. State***, 697 So. 2d 391, 398-99 (Miss. 1997); ***Martin v. State***, 773 So. 2d 415, 417 (Miss. Ct. App. 2000). Under spousal competency standards, a spouse may not be compelled to reveal confidential communications during the discovery process in a case that involves the other spouse without the consent of both. Miss. Code Ann. § 13-1-5 (Rev. 2002), *superceded by* Miss. R. Evid. 601(a). *See also* Miss. R. Evid. 601 cmt.; ***Hood v. State***, 17 So. 3d 548, 553 n.5 (Miss. 2009) (noting that Rule 601 and Miss. Code. Ann. § 13-1-5 are "essentially the same"); ***Fisher v. State***, 690 So. 2d 268, 272 (Miss. 1996).

7

¶12. Here, the same facts negate both spousal privilege and spousal incompetency. Newell's message threatened to *shoot* Diane and Tony. Because this threat would have been communicated to Tony or the police, it is not "confidential" under Rule 504. *See* Miss. R. Evid. 504(a); ***Roland v. State***, 882 So. 2d 262, 266 (Miss. Ct. App. 2004) (denying husband-wife privilege for telephone conversation wife recorded partly because defendant previously had threatened to kill her). But even if we accept Newell's argument that a private threat is not intended for disclosure, both spouses waived Rules 504 and 601 by their respective actions. ***Shell v. State***, 554 So. 2d 887, 894-95 (Miss. 1989), *rev'd in part on other grounds*, ***Shell v. Mississippi***, 498 U.S. 1, 111 S. Ct. 313, 112 L. Ed. 2d 1 (1990) (finding that defendant waived the husband-wife privilege when he encouraged police to corroborate his story by questioning his wife). *See also* Miss. R. Evid. 601(a). Investigators obtained Diane's cell phone on Newell's request. At the time he asked the officers to check her phone, he knew that damaging messages were there. Diane surrendered her phone and provided the password to her voicemail. Thus, neither Rule 504 nor Rule 601 applies.

¶13. Further, the messages satisfy Rule 401's broad definition of relevant evidence. *See* Miss. R. Evid. 401; ***May v. State***, 24 So. 2d 957, 965 (Miss. 1988). However relevant the evidence, the court may exclude it when unfair prejudice outweighs its probative value. Miss. R. Evid. 403. Three to four hours after threatening Diane, Newell arrived at the Slab House to find Boyette standing next to Diane's truck. While disputed, three officers testified that Newell asked Boyette if he previously had answered Diane's cell phone. Newell's first message did specifically threaten Diane and Tony. Further, it is not disputed that Boyette was nonresponsive and hostile to Newell's questioning about Diane's infidelity. The

8

message tends to support the State's theory that Newell acted with malice toward Boyette because Newell thought he was one of Diane's lovers. *Davis v. State*, 767 So. 2d 986, 997 (Miss. 2000) (finding evidence of defendant's prior threats against a third party relevant to show motive, intent, and state of mind). Together, the messages explain the chain of events and affect the State's theory on Newell's state of mind, and Newell fails to show that their value was substantially outweighed by the danger of unfair prejudice. *See* Miss. R. Evid. 401, 403. We find no error in the admission of the messages into evidence. *Mingo*, 944 So. 2d at 28. While the messages were relevant to the State's prosecution for deliberate-design murder, we make no findings on their relevance or probative value in further proceedings.

## II.     Relevance of Boyette's toxicology results

¶14.    Newell next asserts that the trial court improperly refused to allow evidence of Boyette's toxicology results. During the trial, Newell attempted to cross-examine Dr. Steven Hayne, who had performed Boyette's autopsy, regarding Boyette's blood toxicology, but the trial court excluded it.[8]

¶15.    The trial court ruled that evidence of Boyette's toxicology was irrelevant and invited speculation by the jury, because at the time Dr. Hayne testified, no evidence had been brought forth to show that Boyette had been acting violently. But when Dr. Hayne took the stand, Jason Hollis already had testified that Boyette and Newell had been in a "heated

---

[8]Part of the autopsy report proffered by Newell indicated that at the time of death, Boyette's alprazolam concentration was 0.06 micrograms per milliliter. The court noted that alprazolam would have made Boyette less aggressive, but defense counsel stated that studies show that the therapeutic level is around 0.02, and the toxic level is 0.10. So he opined that Dr. Hayne would agree that Boyette's level of 0.06 was three times the therapeutic level, which could cause disinhibition and aggressive behavior.

argument," and that Boyette had shut the door on Newell's leg. And the officers who had overheard Newell's conversation with Sullivan all had testified that Newell had told Sullivan that Boyette had beaten his truck windows and cursed at him. So evidence of Boyette's allegedly aggressive or violent behavior had in fact been presented prior to Dr. Hayne's testimony.

¶16. This Court held in *Byrd v. State*, 123 So. 867, 869 (Miss. 1929), that the defendant can raise the victim's intoxication to demonstrate all the conditions existing at the time of and giving rise to the killing, including the victim's mental state. Specifically, we explained that:

> In determining whether the defendant acted in self-defense, it is competent to show all the circumstances under which the fatal difficulty occurred, and which would in any manner have affected the defendant's motives and apprehensions, or indicate the mental state of the deceased. The defendant may show the deceased's intoxication as bearing upon his motive or intention and the defendant's belief in the imminence of his danger.

*Byrd*, 123 So. at 869 (internal citations omitted). *See also Huggins v. State*, 911 So. 2d 614, 617 (Miss. Ct. App. 2005) (affirming trial court's limiting instruction, directing jury to consider victim's blood-alcohol content in relation to victim's state of mind at time of shooting, not as to whether victim was aggressor). Intoxication evidence offered for this reason is admissible so long as its relevance has been established by the time the evidence is offered. *See Farmer v. State*, 770 So. 2d 953, 958 (Miss. 2000). *See also* 29 Am. Jur. 2d *Evidence* § 307 (2010) ("'Irrelevant' evidence denotes evidence that does not logically tend to prove or disprove any material fact or proposition *that has been placed at issue*.") (emphasis added).

10

¶17. We conclude that, at the time Dr. Hayne testified, the relevance of Boyette's toxicology results had been established. The jury obviously knew that Newell was on trial for fatally shooting Boyette, and it already had heard that the shooting had occurred soon after Boyette's allegedly aggressive and violent behavior, evidence of which had been presented through testimony by Hollis and the officers present at the stand-off. So under *Byrd*, Boyette's toxicology results were relevant to show "all the circumstances under which the fatal difficulty occurred, and which would in any manner . . . indicate the mental state of the deceased." *Byrd*, 123 So. at 869. Therefore, the exclusion of Boyette's toxicology results was an abuse of discretion, because the relevance of that evidence had been established at the time Dr. Hayne took the stand. *Farmer*, 770 So. 2d at 958.

¶18. But we will not reverse the trial court's evidentiary ruling unless the error adversely affects a substantial right of a party. *Mingo*, 944 So. 2d at 28; Miss. R. Evid. 103(a). Here, Newell's theory of the case was self-defense, and evidence of Boyette's toxicology could have affected the jury's understanding of Boyette's motive or intention and Newell's belief in the imminence of his danger. *Byrd*, 123 So. at 869. So the exclusion of the evidence prevented Newell from fully presenting his theory of the case to the jury and thus adversely affected his right to a fair trial. Therefore, the exclusion of the toxicology evidence is reversible error. *Mingo*, 944 So. 2d at 28. In finding that, under the facts before us, the state of Boyette's blood toxicology and resultant impairment is relevant, we do not say that the toxicology report is admissible or that Dr. Hayne is competent to offer testimony in this area. Those matters are left for determination in further proceedings on remand.

**III.     Jury instructions**

11

¶19.    Newell also challenges the trial court's refusal of several of his proposed jury instructions, which he asserts eviscerated his theory of self-defense.  Specifically, Newell challenges the trial court's refusal of his separate jury instruction defining the specific elements of self-defense (D-6), and several separate instructions on the "Castle Doctrine" (D-7, D-8, and D-22).

¶20.    It is well settled that jury instructions generally are within the discretion of the trial court, so the standard of review for the denial of jury instructions is abuse of discretion. *Davis v. State*, 18 So. 3d 842, 847 (Miss. 2009) (citing *Higgins v. State*, 725 So. 2d 220, 223 (Miss. 1998)).  This Court has explained that jury instructions must be considered together:

> In determining whether error lies in the granting or refusal of various instructions, the instructions actually given must be read as a whole.  When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found.  There is no error if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law.

*Rubenstein v. State*, 941 So. 2d 735, 784-85 (Miss. 2006) (internal quotations and citations omitted).  Additionally, we have explained that "[a] defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Hearn v. State*, 3 So. 3d 722, 738 (Miss. 2008) (quoting *Chandler v. State*, 946 So. 2d 355, 360 (Miss. 2006)).  *See also Brooks v. State*, 18 So. 3d 833, 839 (Miss. 2009).  When serious doubt exists as to whether an instruction should be included, the doubt should be resolved in favor of the

accused. *Davis*, 18 So. 3d at 847 (citing *Stringfellow v. State*, 595 So. 2d 1320, 1322 (Miss. 1992)).

¶21.    We cannot say that the trial court abused its discretion in refusing instruction D-6, since Newell's self-defense theory was covered fairly elsewhere.  The State's self-defense instruction S-7 tracked this Court's recommended instruction, and Newell's counsel expressly stated that he did not object to it.  *See Hearn*, 3 So. 3d at 738.

¶22.    We turn now to the effect of the newly revised "Castle Doctrine," now codified at Mississippi Code Section 97-3-15(3)-(4).  Miss. Code Ann. § 97-3-15 (Rev. 2006).  The revision creates a presumption of fear and abridges a duty to retreat in certain prescribed circumstances.  As the Court of Appeals has stated:

> The Castle doctrine, *which curtailed the duty to retreat and created a presumption that the defendant reasonably feared* imminent death, great bodily harm, or the commission of a felony upon him from a person who has unlawfully and forcibly entered the immediate premises of a dwelling, was enacted effective July 1, 2006, . . . . *See* Miss. Code Ann. § 97-3-15 (Rev. 2006).

*Johnson v. State*, 997 So. 2d 256, 260 n.2 (Miss. Ct. App. 2008) (emphasis added).[9]  It is clear to us that, since the enactment of these statutes, Mississippi's "Castle Doctrine" includes two prongs.  First, under subsection (4), if the defendant is in a place where he had

---

[9] While both the "no duty to retreat" rule and the presumption recently have been codified by these statutes, it has always been the law in this state that one has no duty to retreat from an attack if he is in a place where he has a right to be and is not the initial aggressor or provoker. *See McCall v. State*, 29 So. 1003, (Miss. 1901) ("Flight is one of the means of avoiding danger which was necessary to be made at common law, but is not required in this state."); *Bang v. State*, 60 Miss. 571 (1882); *Long v. State*, 52 Miss. 23, 34 (1876) (explaining that an individual may stand his ground and still be entitled to claim self-defense "so long as he is in a place where he has a right to be . . . and is no[t] the provoker [of], nor the aggressor in the combat").  This rule is codified at Section 97-3-15(4). *See* Miss. Code Ann. § 97-3-15(4) (Rev. 2006).

a right to be, is not the immediate provoker and aggressor, and is not engaged in unlawful activity, he has no duty to retreat before using defensive force. Miss. Code Ann. § 97-3-15(4) (Rev. 2006). And second, if the jury finds that any of the circumstances in subsection (3) are satisfied, the defendant who uses such defensive force is presumed to have reasonably feared imminent death or great bodily harm or the commission of a felony upon him. Miss. Code Ann. § 97-3-15(3) (Rev. 2006).

¶23. The "no duty to retreat" rule, found in Newell's proposed instructions D-7 and D-8, was covered fairly elsewhere, specifically, in the defense's own instruction D-23. Instruction D-23 read:

> The Court instructs the jury that while the danger which will justify the taking of another's life must be imminent, pending, and present, such danger need not be unavoidable except by killing in self-defense. The Defendant, James Newell, need not have avoided the danger to his person presented by the deceased, Adrian Boyette, by flight. *So long as James Newell was in a place where he had the right to be and was not the immediate provoker and aggressor*, he may stand his ground without losing his right to self-defense.

(Emphasis added.) Newell obviously had a right to be in the Slab House parking lot and in his own truck. So the jury was instructed adequately by instruction D-23 that Newell did not have a duty to retreat from Boyette's alleged aggression by leaving his truck or fleeing the parking lot. *See* Miss. Code Ann. § 97-3-15(4) (Rev. 2006); ***McCall***, 29 So. at 1003; ***Long***, 52 Miss. at 34 (1876). The trial court did not abuse its discretion by refusing instructions D-7 and D-8.

¶24. But Newell also argues that the trial court erroneously refused proposed instruction D-22, which he asserts correctly defines the new statutory presumption in Section 97-3-15(3). We must determine whether, based on the evidence presented at trial, Newell was

14

entitled to a jury instruction on the new statutory presumption, and if so, whether instruction

D-22 correctly defines the presumption.

¶25.    Mississippi Code Section 97-3-15(3) provides that:

> A person who uses defensive force *shall be presumed* to have reasonably feared imminent death or great bodily harm, or the commission of a felony upon him or another or upon his dwelling, or against a vehicle which he was occupying, or against his business or place of employment or the immediate premises of such business or place of employment, if the person against whom the defensive force was used, was in the process of unlawfully and forcibly entering, or had unlawfully and forcibly entered, a dwelling, occupied vehicle, business, place of employment or the immediate premises thereof or if that person had unlawfully removed or was attempting to unlawfully remove another against the other person's will from that dwelling, occupied vehicle, business, place of employment or the immediate premises thereof and the person who used defensive force knew or had reason to believe that the forcible entry or unlawful and forcible act was occurring or had occurred. This presumption shall not apply if the person against whom defensive force was used has a right to be in or is a lawful resident or owner of the dwelling, vehicle, business, place of employment or the immediate premises thereof or is the lawful resident or owner of the dwelling, vehicle, business, place of employment or the immediate premises thereof or if the person who uses defensive force is engaged in unlawful activity or if the person is a law enforcement officer engaged in the performance of his official duties;

Miss. Code Ann. § 97-3-15(3) (Rev. 2006) (emphasis added). The meaning and application

of the newly revised "Castle Doctrine" presumption and its exceptions is a matter of first

impression before this Court.

¶26.    At trial, Newell testified that, after Boyette had shut the door on his leg, and just after

he had gotten the truck door completely closed, Boyette was beating on the truck and yelling,

"I'm fixing to get you . . . I'm fixing to – get [yourself] out of that truck."  After this, Newell

testified that Boyette grabbed on the door, as if he were trying to open it.  Newell stated that

he thought Boyette was going to try to open the door and assault Newell while he was sitting

15

in the truck or that Boyette was going to try to "snatch" Newell out of the truck. Newell also testified that, when he opened the door slightly to get out, Boyette began grabbing at his own pocket and threatened to cut Newell. So Newell's testimony alone appears to raise the presumption in Section 97-3-15(3).

¶27. The trial court ultimately refused instruction D-22, finding that it was not supported by the evidence. Specifically, the court explained that:

> [T]his one is not supported by the facts, because the uncontradicted evidence is your client gets out of his vehicle and shoots the man outside of the vehicle. He doesn't roll the window down and shoot him through the window, he doesn't sit in his vehicle and shoot him as the man opens the door, he gets out and shoots him.

As applied to the unique facts of this case, we disagree with this conclusion.

¶28. Although Section 97-3-15(3) does not expressly refer to the location of the person who uses defensive force, it does refer to the "vehicle which he was occupying." Miss. Code Ann. § 97-3-15(3) (Rev. 2006). And Section 97-3-15(3) also states that the person who uses defensive force is entitled to the presumption only "if the person against whom the defensive force was used, was in the process of unlawfully and forcibly entering . . . a[n] . . . *occupied* vehicle . . . or if that person . . . was attempting to unlawfully remove another against the other person's will from that . . . *occupied* vehicle . . . ." Miss. Code Ann. § 97-3-15(3) (Rev. 2006) (emphasis added). So the statute requires the person who used defensive force to have been "occupying" his vehicle, but it does not expressly refer to *when* exactly that person must have used defensive force. This ambiguity lends itself to two possible interpretations.

¶29. Perhaps the person who uses defensive force must be occupying his vehicle *at the moment he uses defensive force*. This is the construction given by the trial court. Under this

16

interpretation, Newell would not be entitled to the presumption in Section 97-3-15(3). Newell himself testified that he had exited the truck and was outside it when he shot Boyette. And Newell's testimony was corroborated by Sullivan and Officers Smith and Patrick. So, at the moment Newell used defensive force, Boyette could not have been in the process of entering an *occupied* vehicle, because Newell's truck was no longer occupied. And Boyette also could not have been attempting unlawfully to remove Newell from an occupied vehicle against his will, because Newell was already outside the truck.

¶30.   But the statute also may mean that the person who uses defensive force must be occupying his vehicle *when the person against whom defensive force is used takes the actions that result in its use*. We think this is the most reasonable interpretation of the statute. The first interpretation would require vehicle occupants to wait for the attacker to gain entry to the vehicle before defending themselves or to open the door or window to do so, which would provide easier access for the assailant. Also, the first interpretation does not account for a vehicle occupant's need to exit the vehicle to use defensive force to protect another occupant from the assailant's attack. We do not believe that the Legislature intended for persons threatened by physical violence in their own automobiles to remain inside the vehicle at all costs to be entitled to the presumption in Section 97-3-15(3). If the occupant is still in danger after exiting the vehicle, and he is still "in the immediate premises thereof[,]" he should be allowed to use reasonable force to defend against the danger and still be presumed to have acted in reasonable fear of imminent death or great bodily harm. Miss. Code Ann. § 97-3-15(3) (Rev. 2006).

17

¶31. Following this interpretation, if the jury believed Newell's version of the events, he would have been entitled to the presumption in Section 97-3-15(3). Although the initial interaction between Newell and Boyette took place in the Slab House parking lot, Boyette's first act of physical aggression against Newell, slamming the truck door on his leg, took place while Newell was entering his truck. And Newell testified that while he was inside the truck, Boyette was banging on the truck, grabbing the door, yelling and cursing at Newell, and threatening to "snatch" Newell out of the truck. Newell stated that he responded to Boyette's aggression by pushing the door open just enough to step out quickly, at which point Boyette grabbed at his own pocket while threatening to cut Newell. So Newell fired a single shot at Boyette, jumped back into his truck, and sped away. Hence, according to Newell, he utilized force while he was still "in the immediate premises" of the truck and while he still perceived danger from Boyette. Therefore, based solely on Newell's testimony, the jury should have been instructed on the "Castle Doctrine's" new statutory presumption, as codified in Section 97-3-15(3).

¶32. Now we must decide whether instruction D-22 defines the new statutory presumption in Section 97-3-15(3). Instruction D-22 states that:

> The Court instructs you that the killing of another human being shall be justifiable when committed by any person in resisting any attempt unlawfully to kill such person or to commit any felony upon him, or in any occupied vehicle in which such person shall be.
>
> A person who uses defensive force shall be presumed to have reasonably feared imminent death or great bodily harm, or the commission of a felony upon him or another or against a vehicle which he was occupying if the person against whom the defensive force was used, was in the process of unlawfully and forcibly entering or had unlawfully and forcibly entered, an occupied vehicle, or if that person had unlawfully removed or was attempting to

18

unlawfully remove another against the other person's will from that occupied vehicle and the person who used defensive force knew or had reason to believe that the forcible entry or unlawful and forcible act was occurring or had occurred.

¶33. The first paragraph of this instruction closely follows the language of the justifiable-homicide statute. *See* Miss. Code Ann. § 97-3-15(1)(e) (Rev. 2006). But it removes any references to dwellings, businesses, places of employment, and the immediate premises thereof. It thus defines justifiable homicide as it relates specifically to an occupied vehicle only. And the second paragraph of the instruction tracks the language of the "Castle Doctrine's" new presumption in Section 97-3-15(3), but again refers only to an occupied vehicle, to match the facts of the case. *See* Miss. Code Ann. § 97-3-15(3) (Rev. 2006). While not artfully drawn or properly organized, instruction D-22 states the law regarding the statutory presumption as it applied to the facts of this case. And instruction D-22 is the only instruction proposed by either side that outlines the presumption in Section 97-3-15(3). So the new "Castle Doctrine" presumption was not covered elsewhere.[10]

¶34. We hold that the jury should have been instructed that, if it believed Newell's version of the events surrounding his altercation with Boyette, then it should presume that Newell used defensive force against Boyette because he "reasonably feared imminent death or great bodily harm, or the commission of a felony upon him . . . or against the vehicle which he was

---

[10] Refused instruction D-9 also discusses the presumption, but it states that "a person who unlawfully and by force enters or attempts to enter a person's occupied vehicle or attempting to unlawfully remove another against he other person's will is presumed to be doing so with the intent to commit an unlawful act involving force or violence." The "Castle Doctrine" in some states may include this type of presumption (*see* Florida Statutes Annotated Section 776.013(4)), but Mississippi's does not. *See* Miss. Code Ann. § 97-3-15 (Rev. 2006). So instruction D-9 was an incorrect statement of the law.

occupying . . . ." Miss. Code Ann. § 97-3-15(3) (Rev. 2006). Instruction D-22 would have accomplished this, so the trial court abused its discretion by refusing instruction D-22. Had it been instructed properly on the new "Castle Doctrine" presumption, the jury may have come to a different conclusion regarding the reasonableness and necessity of Newell's action against Boyette, which would have given more weight to Newell's self-defense claims. So the refusal of instruction D-22 necessitates a new trial.

## CONCLUSION

¶35.    The trial court did not err in admitting the voicemail messages into evidence. The trial court committed reversible error by excluding the evidence of the victim's toxicology on the basis of relevance and by refusing Newell's request for a jury instruction on the newly revised statutory presumption under the "Castle Doctrine." Therefore, we reverse Newell's conviction and sentence, and remand this case to the trial court for a new trial consistent with this opinion.

¶36.    **REVERSED AND REMANDED.**

**CARLSON, P.J., LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR. RANDOLPH, J., CONCURS IN PART AND IN RESULT WITHOUT SEPARATE WRITTEN OPINION. DICKINSON, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY GRAVES, P.J. RANDOLPH, J., JOINS IN PART.**

**DICKINSON, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶37.    I agree with the majority on all but one issue. The majority holds that neither spousal privilege applies to the voicemails Newell left for his wife, Diane. Specifically, the majority states that the voicemails were not barred by Mississippi Rule of Evidence 504, concluding

20

that the messages "would have been communicated" to third persons and finding that each spouse waived Rules 504 and 601 — Newell by asking the police to examine Diane's cell phone, and Diane by turning over her cell phone and voicemail password. Because I believe the majority's analysis of Rules 504 and 601 is flawed, I respectfully dissent, in part.

¶38. Mississippi Rule of Evidence 504 renders inadmissible a "communication . . . made privately by any person to that person's spouse and [] *not intended* for disclosure to any other person."[11] That Diane was Newell's spouse is not in dispute, so the issue is whether Newell *intended* the voicemails to be disclosed to any other person, and in addressing this issue, it does not matter whether the communication actually *was* disclosed by Diane, or even whether the communication was *likely* to be disclosed by Diane; unless Newell *intended* for Diane to disclose the communications, Mississippi Rule of Evidence 504's privilege applies.

¶39. There is simply no evidence that Newell intended Diane to disclose to anyone the content of his voicemails to her. It strains credibility to suggest that one would leave a threatening, incriminating voicemail with the intent that it be disclosed to others. And because the record includes no evidence that Newell intended Diane to relay his voicemail to a third party, I would hold that the voicemails were privileged.

¶40. Waiver of Rule 504's privilege requires the consent of both spouses.[12] The majority finds that both Newell and Diane implicitly consented to the introduction of the voicemails. Specifically, the majority finds that Newell consented by asking "the officers to check

_____

[11] Miss. R. Evid. 504(a) (emphasis added).

[12] Miss. R. Evid. 601(a).

21

[Diane's] phone, [knowing] that damaging messages were there," and Diane consented by "surrender[ing] her phone and provid[ing] the password to her voicemail."

¶41.    The majority misapprehends Newell's request.  Newell asked the police to "seize" Diane's phone and inspect the call log to confirm his suspicion that Diane was cheating on him.  The record includes no evidence the "damaging messages were there" on the phone, itself.  Since we are guessing, it is more likely that the messages were stored on the cell phone carrier's computers, and accessed by calling in with a password or code.  In any case, Newell never authorized the police to listen to the voicemails.

¶42.    While I agree with the majority that the trial court's exclusion of toxicology evidence and refusal of a "Castle Doctrine" instruction constituted reversible error, I would hold that the voicemails Newell left for Diane were inadmissible.

**GRAVES, P.J., JOINS THIS OPINION.  RANDOLPH, J., JOINS IN PART.**